United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 20, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-60253

United States of America

Plaintiff-Appellee,

v.

J.D. Bell

Defendant-Appellant.

No. 03-60254

United States of America

Plaintiff-Appellee,

v.

Charles Cotton

Defendant-Appellant.

Appeals from the United States District Court
For the Northern District of Mississippi, Aberdeen

Before DeMOSS, DENNIS and PRADO, Circuit Judges.

DeMOSS, Circuit Judge:

Co-Appellants, J.D. Bell and Charles Cotton, were convicted in
separate jury trials of the crime of aggravated sexual abuse on an

Indian Reservation, pursuant to 18 U.S.C. §§ 1151, 1153(a), 2241(a) and 2246(2). Their appeals were consolidated by this Court. On appeal, Bell and Cotton raise one similar issue and several separate issues. We reject all of Bell's contentions on appeal and therefore affirm his conviction. We also reject most of Cotton's contentions, however, we hold that Cotton's Sixth Amendment Confrontation Clause right was violated but this error was harmless and therefore we affirm his conviction and sentence.

## BACKGROUND

J.D. Bell and Charles Cotton, members of the Mississippi Band of Choctaw Indians, were charged by Indictment in United States District Court for the Northern District of Mississippi on October 30, 2002, with two counts of aggravated sexual abuse in violation of 18 U.S.C. §§ 1151, 1153(a), 2241(a), and 2246(2). Bell and Cotton were alleged to have sexually abused Lee Jim, Jr., and George Cotton on October 14, 2002, on the Choctaw Indian Reservation in Winston County, Mississippi. Prior to trial, Cotton moved that the court sever the trials and the court granted the motion. Bell's jury trial took place in December of 2002, and Cotton's trial was held in March of 2003. Both Bell and Cotton were found guilty of one count of sexual abuse by their respective juries and convicted and sentenced by the district court. Although, most of the facts were controverted at both trials, the following facts were presented to the juries at the two separate

2

trials and could have been relied on by the juries in reaching their verdicts.[1] Facts relevant to a particular issue are outlined in more detail in each section of the Discussion infra.

Lee Jim, Jr., a 52-year-old Choctaw Indian, testified that he was mowing the yard of George Cotton on October 14, 2002. George was apparently observing Jim's mowing. George Cotton is also a Choctaw Indian and is deaf and mute. Charles Cotton, one of the appellants in this consolidated appeal, approached and told Jim and George to go to Jim's house. Charles Cotton, his wife, and J.D. Bell, the other appellant in this consolidated appeal, went to Jim's house. They arrived at the house before Jim and George arrived and entered the house, even though Jim had left the house locked. According to Jim's testimony and Bell's confession, Bell allegedly brought whiskey with him and after Jim and George arrived, Charles Cotton instructed Jim to drink whiskey. Jim did not want to drink whiskey because, he said, he was too hot from pushing a lawn mower. Charles Cotton forced Jim to play "quarters," a drinking game where the loser is forced to drink while the winner watches. This drinking game went on for hours and

---

[1] Neither Bell nor Cotton directly challenge the sufficiency of the evidence supporting their convictions, however, insofar as their arguments can be interpreted as a challenge to the sufficiency of the evidence presented by the government, we are required to "determine whether a rational jury could have found that the evidence established guilt beyond a reasonable doubt on each element of the offense, drawing all reasonable inferences from the evidence and viewing all credibility determinations in the light most favorable to the verdict." United States v. Solis, 299 F.3d 420, 425 (5th Cir. 2002).

3

it was late afternoon before the game concluded. Jim testified that he eventually drank half a bottle of whiskey and "got dizzy." At Bell's trial, Jim also testified that Charles Cotton hit Jim on the side of the head and he then fell down. Apparently, at both trials Jim testified that Cotton shaved Jim's eyebrow, took Jim's pants off, took Jim's wallet, then anally raped Jim. Charles Cotton did this by grabbing Jim around the waist so that Jim felt he could not get away. As Jim was being raped, he observed J.D. Bell raping George Cotton. Jim testified that Cotton left semen in him and around him but there was never any physical evidence of semen found on Jim or at the scene. Jim also testified that he observed that George was covered in blood after the assaults but there was no other testimony of this, other than George's testimony, and there was no physical evidence of blood at the scene.

Jim admitted on cross-examination that he had drank some antiseptic earlier in that day. Likewise, there was testimony establishing that Jim and George were low functioning alcoholics who often drank antiseptic.

George Cotton testified, through the use of his sister, Pauline Cotton, as an interpreter, on direct examination that after mowing his lawn, he and Lee Jim went to Jim's house. There J.D. Bell, Charles Cotton, and Charles Cotton's wife joined them. George testified they drank whiskey and also beer and Charles Cotton smoked marijuana. George Cotton testified he saw Charles

4

Cotton hit Lee Jim and have sexual contact with Jim.

George Cotton testified that J.D. Bell had raped him that afternoon. George also testified that he was covered in blood after the assault. On cross-examination, when confronted with alleged inconsistencies and a misidentification made during an earlier competency hearing, George Cotton repeatedly identified J.D. Bell as the man who raped him.

Both Bell and Charles Cotton attacked Pauline Cotton's interpretation of George Cotton's testimony. Charles Cotton offered the testimony of Junior Cotton, a next-door neighbor familiar with George Cotton's method of communicating. Junior testified that Pauline had not interpreted George's testimony accurately.

The government also presented the testimony of Millie Chickaway, who testified that her aunt came to get her on the afternoon of October 14 to take her to Lee Jim's house. When they arrived at the house Chickaway heard loud music that was not the type of music Jim listened to. It had just gotten dark and she could not see inside the house. When she went inside and turned the lights on she saw Jim lying face down with his pants and underwear down around his ankles. According to Chickaway, Jim and the floor were covered in flour, buttermilk, and cleaning solution. She also noticed feces around his legs and "buttock area." She saw that Jim's face was swollen and part of his hair was shaved off. She testified that the house smelled like alcohol and feces.

5

Chickaway also testified that George Cotton was sitting under a counter-top bar making noises and signaling with his hands but she could not understand him. She testified that George appeared to be covered in flour and milk as well. Chickaway went to Clay Wesley's nearby home to seek assistance.

Wesley testified that he arrived at the scene, shortly after sunset and probably around 8:00 p.m. He described the scene just as Chickaway had. Wesley added that he noticed Jim's head and eyebrows were shaven. Wesley noticed feces but testified that Jim's "rear end was clean." Wesley tried to communicate with George, because he was familiar with George's method of communicating, but George was so upset and talking with his hands so fast, Wesley could not understand everything George was trying to communicate. Wesley testified that he had never seen George so upset and agitated. Wesley also testified that George's pants were undone and his "private part[s]" were showing. Wesley said the house had a "whiskey smell" and he saw a shot glass on the counter. On cross-examination he identified the smell as bourbon whiskey, noting he was familiar with the smell (this testimony is relevant because there was conflicting testimony as to whether whiskey was consumed in Lee Jim's house that afternoon). Wesley called the police to the scene.

Choctaw police officer Chris John testified that when he arrived on the scene Lee Jim was unconscious, face down on the ground with his pants about his ankles. Jim had a bleeding cut

6

above his ear.  Officer John observed feces near where Jim was lying and stated that it appeared someone had poured "milk and flour all over him."  When Officer John rolled Jim over he observed that someone had shaved Jim's eyebrows and some of his hair off. He noticed Jim's face was swollen and it appeared that someone had beaten Jim.

Officer John also observed George and noticed that George's eyebrows had been shaven and he had cuts on his head as well.  It appeared someone had also poured milk and flour on George.

Officer John observed three shot glasses and found Jim's wallet but saw no money.  John described an "awful stench" from the feces and alcohol.  There were no whiskey bottles found at the scene.  There was, however, an empty antiseptic bottle found.

Jim was sent to the hospital that evening for treatment of his injuries.  Clay Wesley took George Cotton to George's home because according to Wesley, besides being distraught, George appeared physically fine.

Jim was examined by Dr. Peters on the evening of the alleged assault.  Medical records in the case established that either Jim did not complain of sexual assault or Dr. Peters and the nurses were unable to understand Jim as complaining of sexual assault. Jim testified that there was no interpreter or family member present for his medical examination and that he tried to

communicate to the medical workers what had happened.[2]  Dr. Peters noted that Jim was suffering from the effects of intoxication and chronic alcoholism.  Dr. Peters also noted in his report that Jim complained of being pushed by his son-in-law.  In his testimony, Jim denied this and said it was a misunderstanding because he did not even have a son-in-law.  According to Dr. Peters, Jim never complained of being sexual assaulted or of any anal pain.  Jim testified that he complained of anal pain but was misunderstood.  Jim was also examined on October 21 by Dr. Duckworth and Dr. Logan.  The doctors did not understand there to be a complaint of sexual assault nor did the doctors find evidence of sexual assault.  Jim was finally examined for evidence of sexual assault on October 28 by Dr. Callahan, but no evidence was found.

George Cotton was examined on October 18 by Dr. Callahan, but no evidence of sexual assault was found.  Ultimately, there was no medical evidence of sexual assault presented at either trial, but neither victim was examined for sexual assault until several days after the alleged sexual assaults and the testimony presented by the government indicted it was not unusual for no evidence of anal rape to be found that many days after the alleged incident.

In the trial of J.D. Bell, F.B.I. Special Agent Sypniewski testified about an interview of Bell that Sypniewski and Choctaw

---

[2]  Apparently, Jim's ability to communicate in English was limited and he could have benefitted from an interpreter who spoke Choctaw.

Police Officer Butler conducted on October 25, 2002. Apparently, Bell at first denied any involvement in the sexual assaults but ultimately confessed to raping George Cotton. During the interview the officers told Bell they did not believe him when he stated he was not involved in the crime and they told Bell that lying to them could cause Bell to serve jail time. The officers also lied to Bell, telling him that they had physical evidence linking him to the assault of George Cotton when they did not.

At the end of the interview, Bell gave a written statement confessing that "Charles [Cotton] had anal sex [with] Lee Jim, Jr., and I had anal sex with George Cotton. Lee Jim and George did not want this to happen." Bell stated he felt remorse for his acts. There was also a longer typewritten statement signed by Bell. In this statement Bell explained the events of October 14. Bell stated that: Charles Cotton hit Lee Jim several times after Jim became upset at Cotton for making fun of him, after Jim was knocked down to the floor, Cotton pulled down Jim's pants and underwear and told Bell, "Watch this, I'm gonna fuck this one," then Cotton had anal sex with Jim against Jim's will and Jim tried to push Cotton away but Cotton was too strong. Bell stated that he then pulled George Cotton's pants and underwear down and had anal sex with George Cotton who was too intoxicated to make an effort to resist. Bell also admitted to bringing whiskey to Jim's house that afternoon. In his statement Bell said he felt dirty after the assaults, that he did not mean to hurt George, that he felt bad for

9

George, and that he had never had sex with a man before.  Bell also stated that he did not ejaculate when he raped George.  Bell further stated that Charles Cotton was "crazy and may have sexually assaulted men before."  Bell said Charles Cotton was laughing about the assaults immediately after they were finished and that Cotton had told Bell to keep his mouth shut regarding the assaults.  Bell said he agreed to testify against Cotton and understood that the interviewers could make no promises in return for Bell's cooperation.

Agent Sypniewski was subject to cross-examination concerning the interview and his report of the interview was entered into evidence.  Bell's statement and the agent's testimony verified that Bell wrote and read English and also understood his rights when making the statement.

On October 28, 2002, a U.S. Magistrate Judge issued a warrant for the arrest of Bell and Cotton, who were arrested the next day.  On October 30, 2002, a grand jury returned an indictment charging Bell and Cotton with sexually abusing the two male Choctaws.  On motion of the government, the U.S. Magistrate Judge detained Cotton.

Bell filed several pretrial motions, including motions to suppress his out-of-court confession and to prevent George Cotton from testifying, arguing that he was incompetent because he could not hear or speak.  Prior to trial, Cotton moved for severance based on co-defendant Bell's confession of raping George Cotton.

10

The district court granted Cotton's motion.

After selecting juries for the two trials, the district court held a hearing on Bell's motion to suppress his confession and his motion to disqualify George Cotton from testifying, which Charles Cotton joined. The court observed George and the proposed interpreter, Pauline Cotton, George's sister. At one point during the hearing, George Cotton misidentified Bell as the person who assaulted Lee Jim and Cotton as the person who assault him. However, after observing George and Pauline, the district court found George competent and allowed Pauline to serve as his interpreter. The court also denied the motion to suppress Bell's statement, finding the statement was voluntary.

As described supra, at both trials the government presented the two victims, who testified that they were raped and that each observed the other being raped. Other witnesses testified to the scene and to the condition of the two victims.

Both Bell and Cotton attempted to create an alibi. The jury heard evidence from Cotton's wife, mother, and two aunts, attempting to establish that Bell and Cotton were at Cotton's mother's house all afternoon except when they went with Cotton's wife to Cotton's aunt's house around 4:30 p.m. There was some other alibi evidence, some of which was conflicting but ultimately there was a period of time from 2:00 p.m. until 4:30 p.m. where no alibi was established. The government argued at both trials that the sexual assaults occurred during this open period of time. Bell

and Cotton argued that the testimony the government presented at Bell's trial established that the assaults occurred at 2:00 p.m. and the testimony at Cotton's trial established that the assaults occurred at 6:00 p.m.

Bell chose not to testify at his trial.  Charles Cotton and his wife, Phyllis, testified at Cotton's trial that Lee Jim's and George Cotton's testimony was inaccurate.  Charles and Phyllis testified that Bell, Charles, and Phyllis Cotton went to Jim's house that afternoon but Jim and George were already there drinking antiseptic.  Charles and Phyllis further stated that neither they nor Bell ever entered the house.

At his trial, Charles Cotton also denied the sexual assault allegations, claiming that he was a heterosexual and his love for women would prevent him from raping a man.  Cotton did, however, admit that he had in the past shaved off Jim's eyebrows and hair and pulled down Jim's pants, claiming it was "humor."

After Bell's trial, the court granted judgment of acquittal as to Count II of the Indictment, the charge alleging that Bell sexually abused Lee Jim.  The jury convicted J.D. Bell of sexually abusing George Cotton.  After his trial, Bell filed a motion for judgment of acquittal or, in the alternative, for a new trial.  The district court denied the motion, and on March 6, 2003, the district court sentenced Bell to, inter alia, 72 months' incarceration.  Bell filed a notice of appeal on March 11, 2003.

After Bell's trial but before the trial of Charles Cotton, the

12

government requested that the district court immunize Bell and ordered him to testify in Charles Cotton's trial. After being immunized, Bell refused to testify and the district court held that Bell was unavailable under the Federal Rules of Evidence. The government then introduced, over Cotton's objections, a summary of portions of Bell's statement, via Agent Sypniewski's testimony, showing: 1) Bell had been advised of his rights and signed a waiver agreeing to give a statement; 2) Bell had brought whiskey to the home of Lee Jim on October 14, 2002; 3) Bell had raped George Cotton that day; and 4) Bell had signed a written statement to that effect and Bell understood what he was signing. Cotton's counsel then cross-examined the agent concern the interview process and the voluntariness and trustworthiness of the statement.

After Cotton's trial, the Court acquitted Cotton as to Count I of his Indictment, the charge for the sexual assault of George Cotton. The jury convicted Charles Cotton of raping Lee Jim, Jr. Cotton filed motions for judgment of acquittal and new trial. The district court denied the motions. On March 6, 2003, the district court sentenced Cotton to, inter alia, 196 months' incarceration. Cotton received an enhanced sentence for causing serious bodily injury and victimizing a vulnerable person. Cotton filed a notice of appeal on March 11, 2003.

This Court consolidated the cases for appeal on July 23, 2003.

On appeal, Bell argues that the district court erred in allowing into evidence his confession because it was not

13

voluntarily given. He also argues that the court erred in instructing the jury concerning the confession. Cotton argues that the district court erred in allowing admission of redacted portions of Bell's confession because it was hearsay with no applicable exception and the admission violated Cotton's Confrontation Clause rights. He argues that the district court erred in instructing the jury concerning the confession. Cotton also argues that the court erred in enhancing his sentence for causing serious bodily injury and victimizing a vulnerable victim. Both Bell and Cotton argue that the district court erred in allowing Pauline Cotton, George Cotton's sister, to serve as interpreter for George at both trials because she was biased and unqualified. Both Bell and Cotton also make a catch-all argument that the cumulative effect of the district court's errors denied each a fundamentally fair trial.

## DISCUSSION

**I.   Whether the district court erred in allowing the government to admit J.D. Bell's confession into evidence at Bell's trial and in its instruction to the jury concerning the voluntariness of the confession.**

A district court's determination that a confession is voluntary is a question of law and is reviewed <u>de novo</u>, but the factual conclusions underlying the determination are reviewed for clear error. <u>United States v. Garcia Abrego</u>, 141 F.3d 142, 170 (5th Cir. 1998). When a defendant challenges the voluntariness of a confession, the government must prove its voluntariness by a

14

preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial. Id. Also, the Supreme Court has held that the admission of an involuntary confession is trial error subject to a harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 310 (1991).

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." United States v. Broussard, 80 F.3d 1025, 1033 (5th Cir. 1996) In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and that there was a link between the coercive conduct of the police and his confession. Colorado v. Connelly, 479 U.S. 157, 163-65 (1986). This Circuit has held that trickery or deceit is only prohibited to the extent that it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002)(en banc); see also Self v. Collins, 973 F.2d 1198, 1205 (5th Cir. 1992) (finding that mere trickery alone will not necessarily invalidate a confession).

The district court held an evidentiary hearing at which Choctaw Police Officer Butler, F.B.I. Special Agent Sypniewski, and J.D. Bell testified concerning Bell's October 25, 2002, confession in which Bell admitted to raping George Cotton. The testimony established that Bell, a 21-year-old Choctaw Indian with limited

15

education, was taken into custody at approximately 2:30 p.m. on October 25, but formal interrogation did not start until after 5:00 p.m. Bell's confession was made shortly before 6:30 p.m. During the one and a half hours of questioning, Bell first denied that anyone was raped at Lee Jim's house that afternoon, then stated he was there but said that he had left the house to vomit because of heavy drinking when Charles Cotton raped both victims. Then Bell changed his story again and stated he had witnessed Charles Cotton raping both of the victims. During the interrogation, each time Bell denied raping anyone, the officers stated they did not believe him. The officers also told Bell that lying to a federal agent was a crime that could result in five years in jail. The officers also lied to Bell and told him that they had physical evidence proving that he had raped George Cotton when they did not have such evidence. Despite the officers' statements regarding the possible imprisonment for lying to a federal officer and the "fake" physical evidence, Bell still did not confess. The officers both testified that Bell only confessed because of, as Bell stated, "his feeling of guilt and remorse" for injuring George Cotton and participating in a homosexual act. At the hearing, the district court found that the techniques used by the officers did not overcome Bell's will and that Bell voluntarily made the confession. Therefore, the court allowed the government to introduce the confession into evidence at Bell's trial.

During Bell's trial, the government called Agent Sypniewski

16

who testified regarding all aspects of the confession and was subjected to cross-examination regarding the circumstances surrounding the confession, including the officer's truthful and false statements to Bell and the voluntariness of the confession. At the conclusion of the trial, the court instructed the jury regarding the confession and voluntariness.[3]

On appeal, Bell argues that the two interrogation techniques: informing Bell that if he lied he could go to jail and lying to Bell about the existence of physical evidence that connected him to the sexual assault, even if permissible by themselves, when combined created an impossible situation for Bell to withstand, thereby forcing Bell to make the confession, even if he was innocent of the crime confessed.

---

[3] The instruction was patterned after:

§ 1.26. Confession--Statement--Voluntariness (Single Defendant)

In determining whether any statement, claimed to have been made by a defendant outside of court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence concerning such a statement with caution and great care, and should give such weight to the statement as you feel it deserves under all the circumstances.

You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the defendant, his treatment while under interrogation, and all the other circumstances in evidence surrounding the making of the statement.

Instruction 1.26, Fifth Circuit Pattern Jury Instructions: Criminal (West 2001).

17

Bell cites no authority for his argument that the officers' conduct was coercive or that it caused him to make an involuntary confession. Bell merely makes the circular argument that no matter what he said in response to the officers' questions he would be sent to jail, i.e., whether he admitted to raping George Cotton or whether he lied to federal officers. This argument, of course, assumes that denying he committed the rape was actually a lie which in turn indicates it was not the officers' techniques that forced Bell into an impossible position but rather the fact that Bell, according to his own argument, was not actually innocent. Likewise, Bell was not forced to either lie or confess, he could have remained silent.[4] Finally, Bell does not articulate how the officers' lying about the physical evidence caused his confession to be involuntary.

The officers' misrepresentation about the existence of physical evidence is the only potentially coercive conduct at issue in this case. The district court at the hearing found that the conduct did not overcome Bell's will and that Bell's confession was voluntary. Even if the officers' conduct was coercive, it appears Bell has not established that there was a link between the officers' lying about having physical evidence and Bell's confession. Therefore, the district court did not err in allowing

---

[4] Bell ignores the fact that he had the right to remain silent and does not make any arguments implicating a violation of his Miranda rights, other Fifth Amendment rights, or Sixth Amendment rights.

18

the government to present the confession evidence.

Likewise, at trial, Bell's attorney conducted a rigorous cross-examination concerning the confession and argued to the jury that the confession was involuntary. The court instructed the jury as to the voluntariness question. The jury in making its ultimate decision must have concluded that the confession was voluntary or that Bell was guilty without considering the confession. Therefore, either there was no error concerning the admission of the confession and the instruction to the jury because the jury found the confession to be voluntary, or whatever error occurred was harmless. Accordingly, the district court's decision to allow the government to admit the confession into evidence and the court's instruction at Bell's trial are affirmed.

## II. Whether the district court erred when it allowed the sister of George Cotton, a deaf and mute victim, to interpret George's testimony at both trials.

We review the decision to appoint an interpreter for abuse of discretion. United States v. Ball, 988 F.2d 7, 9 (5th Cir. 1993). The district court "must take into consideration the unique circumstances of each case including the interpreter's interest and involvement in the case." Id. at 10. The nature of the witness's handicap may make "it necessary for the trial court to appoint someone familiar with the witness" thus "prevent[ing] the court from obtaining a wholly disinterested person." Id. (internal quotes and citation omitted). The ultimate issue is whether the

19

use of the interpreter "made the trial fundamentally unfair." Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989).

George Cotton is deaf and mute. He is able to effectively communicate through a form of sign language, a system of grunts and gestures, that is understood by family and friends familiar with him. The district court held a competency hearing before Bell's trial to determine whether George would be able to testify and who should serve as interpreter when George testified. At the hearing, Bell and Charles Cotton objected to the use of Pauline Cotton, George's sister, as interpreter. The government proposed another interpreter, Clay Wesley (who also served as a fact witness because he observed the crime scene the night of the alleged sexual assaults) which Appellants also objected to. Charles Cotton offered Junior Cotton as a potential interpreter. Junior knew George because he was George's neighbor and he lived with Charles Cotton's aunt, who served as an alibi witness for Charles Cotton. The government objected to the use of Junior because of his relation to Charles and the fact that he lived with Charles's aunt. The district court decided to allow Pauline Cotton to serve as the interpreter at both Bell's and Charles Cotton's trial. Because Pauline speaks only Choctaw, her interpretation of George's testimony was translated into English by a government interpreter.

Both Appellants make several arguments as to why the district court erred. First, both argue that the Fifth Circuit decision in Prince v. Beto, which held that the district court erred in

appointing the husband of a deaf and mute victim as the interpreter and reversed the defendant's conviction, is controlling in this case.  426 F.2d 875, 876-77 (5th Cir. 1970).  In Prince, however, a panel of this Court held that the husband should have been prevented from serving as interpreter because the defendant had proven that the husband attempted to extort money from the defendant in exchange for the husband attempting to stop the criminal prosecution against the defendant.  Id. at 876.  Yet even the Prince court recognized that in some circumstances it may not be possible to obtain "a wholly disinterested person" as interpreter and "ordinarily a husband could qualify as an interpreter."  Id. at 876-77.  The present case is more similar to United States v. Ball, where the court did allow a family member, the wife, to interpret for a deaf witness.  988 F.2d at 9.  In Ball, much like in the present case, both sides were allowed to question the wife with respect to her ability to interpret.  Id. Ultimately, the Ball court found that the longstanding relationship between the wife and the witness made the wife qualified to serve as interpreter.  Id.  In the present case, Pauline Cotton had no personal knowledge of the events at issue, and the circumstances of George's method of communication made it impossible to find an interpreter who was not a family member or close friend of George. Therefore, Appellants' arguments that Pauline should have been excluded because she was George's sister fail.

Second, both Bell and Charles Cotton claim the use of Pauline

21

Cotton as an interpreter violated the Court Interpreters Act, 28 U.S.C. § 1827. Bell argues that only qualified interpreters can be used. The Act, however, specifically allows for an exception when no qualified interpreter is available. 28 U.S.C. § 1827(b)(2) Charles Cotton claims that Pauline Cotton's non-continuous translation of George's answers was constitutionally unfair and also violated the Act. "[W]ord for word translation" is the "general standard," however, "minor deviations from this standard will not necessarily contravene a defendant's constitutional rights" and in "certain circumstances even 'summary translations'" would be permissible. United States v. Joshi, 896 F.2d 1303, 1309 & n.6 (11th Cir. 1990) (citation omitted). The issue is ultimately whether the use of the interpreter "made the trial fundamentally unfair." Valladares, 871 F.2d at 1566. And because interpreters present numerous trial difficulties, "the trial judge, who is in direct contact with" the witnesses, Appellants, and the interpreters "must be given wide discretion." Id. Here, because of the unique method used by George to communicate and the lack of other options, the district court allowed George to testify via Pauline's interpretation and permitted Appellants to attack the testimony and interpretation. Therefore, there was no violation of the Court Interpreters Act.

Third, Bell also claims his confrontation rights were violated. Bell, however, was able to cross-examine George Cotton and therefore his rights were not violated. Bell also claims

22

George Cotton was not competent, under the Rules of Evidence, to testify.[5] The Federal Rules of Evidence, however, state that "[e]very person is competent to be a witness except as otherwise provided in these rules" and the Rules do not provide that deaf and mute individuals are somehow lacking in competency to be witnesses in federal court. Fed. R. Evid. 601. Therefore, these arguments also fail.

The district court did not abuse its discretion in allowing Pauline Cotton to serve as interpreter but rather allowed the juries to make whatever determinations they believed fair. George Cotton was subject to cross-examination in both Bell's and Charles Cotton's trial. Also, Charles Cotton presented testimony from Junior Cotton, the person Charles proposed should serve as interpreter, as to the alleged erroneous interpretation conducted by Pauline. The juries heard evidence and arguments that Pauline Cotton loved her brother and wanted his attackers to be punished. The court instructed both juries that they were to judge George Cotton's testimony and the interpretation thereof and give whatever weight they deemed appropriate to the evidence. Accordingly, the

---

[5] Bell cites an Eighth Circuit case, Anderson v. Franklin County, Mo., 192 F.3d 1125 (8th Cir. 1999), for the proposition that a deaf and mute who does not know a standardized system of sign language can be found not competent to testify. Id. at 1129. The holding of the Eighth Circuit in Anderson, however, was that there was no "clear and prejudicial abuse of discretion" by the district court when it excluded the videotape testimony of a deaf and mute witness after determining the testimony was not reliable. Id. The Eighth Circuit noted that the testimony would have been "largely, if not totally, cumulative." Id. at 1130.

decision of the district court to allow Pauline Cotton to serve as interpreter at both trials was not an abuse of discretion and is affirmed.

**III. Whether the district court erred in allowing the government to introduce portions of J.D. Bell's statement into evidence at Charles Cotton's trial and in its instruction to the jury concerning the statement.**

Whether the admission of objected-to evidence under Rule 804(b)(3), Federal Rules of Evidence, was proper is a mixed question of law and fact; the factual determinations are reviewed for clear error and the legal issues are reviewed <u>de novo</u>. <u>See</u> <u>United States v. Bagley</u>, 537 F.2d 162, 166 (5th Cir. 1976). Alleged violations of the Confrontation Clause are reviewed <u>denovo</u>, but are subject to a harmless error analysis. <u>United States v. McCormick</u>, 54 F.3d 214, 219 (5th Cir. 1995).

Co-Appellant, J.D. Bell, was convicted of raping George Cotton prior to Charles Cotton's trial. For Charles Cotton's trial, the government sought and obtained an order immunizing Bell's testimony. Bell refused to testify and was held in contempt for refusing to testify. The government then introduced a summation of only part of Bell's statement, via Agent Sypniewski's testimony. Specifically, Agent Sypniewski testified that: 1) Bell had been advised of his rights and signed a waiver agreeing to give a statement (the written waiver was also introduced into evidence as an exhibit); 2) Bell had brought whiskey to the home of Lee Jim on October 14, 2002; 3) Bell had raped George Cotton that day; and

24

4) Bell had signed a written statement to that effect and Bell understood what he was signing.  The testimony introduced did not mention Charles Cotton nor was any of Bell's written statement actually introduced as an exhibit.  Cotton's counsel then cross-examined Agent Sypniewski regarding the interview of Bell, the lack of a videotape record of the interview, the statement made, and Bell's claim that the statement was coerced.

On appeal, Charles Cotton claims the admission of the agent's testimony concerning the statement is hearsay subject to no exception and violates the Confrontation Clause.  Cotton also claims the district court, sua sponte, was required to give a limiting instruction to the jury when the statement was introduced into evidence and that the court did not properly instruct the jury concerning the statement before the jury deliberated.

The hearsay and Confrontation Clause determinations are separate issues, yet courts analyzing these issues have applied the same "particularized guarantees of trustworthiness" test for each. Idaho v. Wright, 497 U.S. 805, 814-15 (1990) (noting that the "hearsay rules and the Confrontation Clause are generally designed to protect similar values" but cautioning against equating the two as equals).

Rule 804(b)(3) of the Federal Rules of Evidence provides in pertinent part:

> (b) Hearsay exceptions.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . .  (3) Statement against interest.  A

25

> statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed. R. Evid. 804(b)(3). Restated, the rule requires: the declarant be unavailable, the statement must subject the declarant to criminal liability such that a reasonable person would not have made the statement unless he believed it to be true, and the statement must be corroborated by circumstances clearly indicating trustworthiness. United States v. Sarmiento-Perez, 633 F.2d 1092, 1101 (5th Cir. 1981) (citations omitted).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause, however, does not require the exclusion of any statement made by a declarant who is not present. Ohio v. Roberts, 448 U.S. 56, 66 (1980). Rather, a statement can be admitted by showing the declarant is unavailable and that the statement "bears adequate 'indicia of reliability.'" Id.

In the present case, the first two requirements of Rule 804(b)(3) and the first requirement of the Confrontation Clause are satisfied. The district court declared Bell unavailable after he

26

had been granted immunity yet refused to testify. Also the district court found that in his statement used at Cotton's trial, Bell admits to a crime so far out of the ordinary, homosexual rape, that no reasonable person would have made the statement unless it was true.

There are two methods for satisfying the third requirement of Rule 804(b)(3), which is also similar to the second requirement of the Confrontation Clause, i.e., the trustworthiness of the statement. United States v. Flores, 985 F.2d 770, 775 (5th Cir. 1993). If the hearsay statements are admitted under a "firmly rooted exception" to the hearsay rule, trustworthiness is presumed. Lilly v. Virginia, 527 U.S. 116, 124-25 (1999); see also Roberts, 448 U.S. at 66. If not, the statements must bear adequate "indicia of reliability," such that "adversarial testing would be expected to add little, if anything, to the statements' reliability." Lilly, 527 U.S. at 124-25; see also Roberts, 448 U.S. at 66.

The Supreme Court has stated that although some statements that fall within the declaration-against-penal-interest concept may be inherently reliable, the concept itself "defines too large a class for meaningful Confrontation Clause analysis." Lee v. Illinois, 476 U.S. 530, 544 n.5 (1986). Therefore, each category of statements that falls within the exception must be analyzed to determine whether statements in that category are inherently reliable. More recently in Lilly v. Virginia, the Supreme Court issued a plurality opinion which followed Lee's framework of

dividing statements into categories. 527 U.S. at 127. The plurality determined that admission of the entire statement of an accomplice that contained portions which inculpated the accomplice and the defendant on trial was "inherently unreliable." Id. at 131. Similarly, this Circuit held in United States v. Flores, a decision prior to Lilly, that "a confession by an accomplice inculpating a defendant that is being offered as a declaration against penal interest is not a firmly rooted exception" to the hearsay rule, and thus not inherently reliable. Flores, 985 F.2d at 775; see also United States v. Dean, 59 F.3d 1479, 1493 (5th Cir. 1995). Accordingly, as per Lilly and Flores, the statement at issue in this case cannot be presumed trustworthy because it does not fit within a firmly rooted hearsay exception.

Because this type of hearsay statement does not fit within a firmly rooted exception, then the required "indicia of reliability" must be shown from "particularized guarantees of trustworthiness." Flores, 985 F.2d at 774-75 (citing Wright, 448 U.S. at 65). The Supreme Court in Wright held that these "particularized guarantees of trustworthiness" include only the relevant circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." Wright, 497 U.S. at 819. Corroborating evidence may not be considered because it "would permit . . . bootstrapping on the trustworthiness of other evidence

28

at trial." <u>Id.</u> at 823.[6]

Again, a panel of this Circuit in <u>Flores</u> held that "statements accusatory of another taken by law enforcement personnel with a view to prosecution" should "generally be regarded as inadmisssable under the Confrontation Clause" because they are "inherently unreliable." <u>Flores</u>, 985 F.2d at 780. This holding, although concerned with the admission of an entire statement that was taken from grand jury testimony provided by a co-defendant who had plead the Fifth Amendment and was therefore unavailable to testify at a joint trial, likely limits our inquiry in the present case.[7] Because of the holding in <u>Flores</u>, we must conclude that the statement admitted here was also "inherently unreliable."

_____

[6] The Confrontation Clause analysis excludes corroborating evidence because the rationale for allowing the evidence is "that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." <u>Wright</u>, 497 U.S. at 819 (quoting from 5 J. Wigmore, Evidence § 1420, p. 251 (J. Chadbourn ed., rev. 1974)). In other words, the evidence may only be admitted if it is "so trustworthy that adversarial testing would add little to its reliability." <u>Id. at 821</u> The hearsay rule supports the values of the Confrontation Clause; however, in this Circuit if the Confrontation Clause is not implicated and the concern is only whether the statement is within the hearsay exception, the district court can properly consider any corroborating circumstances that clearly indicate that the statement is trustworthy. <u>Dean</u>, 59 F.3d at 1493.

[7] The government in its argument only cites but does not discuss <u>Flores</u>, a decision that likely controls the resolution of this issue in this case. Rather, the government's argument continually cites and relies on <u>United States v. Vernor</u>, 902 F.2d 1182 (5th Cir. 1990), a case this Circuit said in <u>Flores</u> was likely overruled by the Supreme Court's holding in <u>Wright</u> and therefore explicitly overruled by the <u>Flores</u> decision. 985 F.2d at 774-75.

29

In the present case the government argues that the summary of a portion of Bell's statement that was admitted did not inculpate Cotton because it made no mention of Cotton and only inculpated Bell in regards to bringing whiskey to Lee Jim's house and raping George Cotton. The government's argument is essentially that the statement does not accuse Cotton of anything and therefore is not even hearsay and presents no Confrontation Clause problem. This semantic argument fails for two reasons. First, the statement is hearsay whether or not it accuses Cotton of wrongdoing because it is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Second, as to whether there is a Confrontation Clause problem, even the portions of the statement that were admitted inculpate Cotton or they would not have been relevant and therefore not admitted, and as such, their admission presents a Confrontation Clause issue. Cotton claimed, inter alia, at his trial that there was no whiskey at Lee Jim's house, that no one was raped, and that he was not involved with anything that happened to George Cotton. The summary of a portion of Bell's statement was inculpatory to Charles Cotton in regard to these claims insofar as the statement contradicts Cotton's arguments.

The district court found Bell's statement to be trustworthy and allowed it to be admitted despite acknowledging that the statement may not fit within a firmly rooted exception. It is not clear why the district court found the statement to be trustworthy

30

and it is also unclear whether or not the district court impermissibly considered corroborating evidence. In its denial of Cotton's motion for acquittal, the district court states that unlike the statement in <u>Lilly</u>, Bell's statement did not attempt to shift blame and therefore could be considered trustworthy. <u>Citing Lilly</u>, 527 U.S. at 139. But even had the district court not considered corroborating evidence, the <u>Flores</u> holding appears to foreclose the admission of the redacted statement in this case and therefore no inquiry into whether the statement has "particularized guarantees of trustworthiness" is necessary.

Further, it simply is not clear based on this record whether the statement has "particularized guarantees of trustworthiness." Cotton argues that Bell's statement is exactly the type of statement that is considered unreliable because of the circumstances under which it was made, <u>i.e.</u>, a police investigation of an accomplice who may be trying to curry favor or shift blame with the information he is giving. The government, impermissibly relying on corroborating evidence, insists the statement is trustworthy. Viewing the entire statement and the circumstances under which it was made, it does appear that Bell was attempting to shift some of the blame to Cotton, indicating Cotton was the leader or instigator.[8] In fact, before Bell admitted to raping George, he

---

[8] We note, it is not just the portions of the statement that are offered into evidence that are considered when the court is determining the trustworthiness of the statement, the redacted portions are considered as well. <u>See</u> <u>United States v. Alvarez</u>,

31

claims in his statement that Charles Cotton raped both George and Lee Jim. In the statement Bell also says that Charles Cotton is "crazy and may have sexually assaulted men before." On the other hand, it does not appear the statement was made to curry favor with the investigating officers but rather because, according to the investigating officers and portions of Bell's own statement, Bell felt remorse for his acts. Nonetheless, insofar as this statement is governed by the holding in Flores and therefore inadmissible, we are prevented from having to decide this issue anyway.

Because the evidence was improperly admitted, we must determine if the error was harmless. McCormick, 54 F.3d at 219. "For an appellate court to find that a violation of a federal constitutional right is harmless, it must be convinced beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial." United States v. Vejar-Urias, 165 F.3d 337, 340 (5th Cir. 1999).

The testimony of Agent Sypniewski was related to the issues of whiskey and the rape of George Cotton. After the government rested and before Charles Cotton presented his defense, Cotton's counsel motioned the district court for judgment of acquittal as to both counts of the Indictment. The court granted judgment of acquittal as to Count I, which was the charges relating to George Cotton, including the aiding and abetting charge. Therefore, the portions

_____

584 F.2d 694, 701 (5th Cir. 1978).

32

of Bell's statement that were admitted had become, by judgment of acquittal, irrelevant. In fact, following the judgment of acquittal, Cotton's counsel, outside the presence of the jury, asked for the testimony relating the Bell's statement to be stricken due to its lack of relevancy. Accordingly, any error that occurred in admitting the testimony was harmless insofar as the testimony was related to a count of the indictment that Cotton was ultimately acquitted of. Further, insofar as the objected to evidence remained relevant after the judgment of acquittal, the record indicates the information in the portions of Bell's statement that were admitted had already been brought out via the testimony of the victim, Lee Jim, as well as through George Cotton's testimony. Accordingly, admission of the testimony summarizing portions of Bell's statement was harmless error and therefore the jury verdict is affirmed.

Charles Cotton also argues that the district court erred by not, sua sponte, issuing a limiting instruction when Bell's statement was introduced and by not properly instructing the jury before it deliberated. This Court reviews Appellant's claims regarding jury instructions by determining "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." United States v. Wise, 221 F.3d 140, 147 (5th Cir. 2000). Where no objection is made or no request for a jury instruction is given, the Fifth

33

Circuit reviews such claims for plain error. United States v. Iwegbu, 6 F.3d 272, 274 (5th Cir. 1993).

Cotton's argument claiming error fails for several reasons. First, the district court did issue an instruction concerning the voluntariness of the statement prior to deliberation.[9] Second, Cotton erroneously cites several cases for his argument that a limiting instruction had to be issued to cure any Confrontation Clause violation when the statement was admitted into evidence. This argument is erroneous because if there was a Confrontation Clause violation, a limiting instruction would not ameliorate the constitutional problem—the evidence was either permissible or not. Bruton v. United States, 391 U.S. 123, 136-37 (1968); United States v. Jobe, 101 F.3d 1046, 1067 (5th Cir. 1996). Third, at the jury instruction conference, Cotton's counsel was very active in helping craft the instructions and specifically discussed with the judge an instruction addressing the admitted testimony concerning Bell's statement. The district court judge stated that he thought any instruction would unnecessarily draw attention to the testimony and Cotton's counsel seemed to agree. Therefore, there was no error in the instructions.

In summary, the district court erred in allowing Bell's statement to be admitted at Cotton's trial because it did not

---

[9] The instruction given was adapted from Instruction 1.26, Fifth Circuit Pattern Jury Instructions: Criminal (West 2001). See Footnote 3.

satisfy the Rule 804(b)(3) hearsay exception requirements and because it violated the Confrontation Clause; however, the error was harmless.  There was no error concerning the jury instruction.  Accordingly, Cotton's conviction is affirmed.

**IV.  Whether the district court erred in sentencing Charles Cotton.**

We review the sentencing court's factual findings for abuse of discretion and the application of the United States Sentencing Guidelines <u>de novo</u>.  <u>United States v. Scurlock</u>, 52 F.3d 531, 539 (5th Cir. 1995).  If the district court's findings are "plausible" in light of a review of the record as a whole, we will affirm.  <u>Id.</u>

Charles Cotton argues that the district court erred when it enhanced by two-levels his sentence for inflicting "serious bodily injury" under § 2A3.1(b)(4)(B) of the Sentencing Guidelines.  He also argues that the district court erred in enhancing his sentence for victimizing a vulnerable person.

Section 2A3.1(b)(4) provides for a two-level enhancement if "the victim sustained serious bodily injury."  That term is defined in § 1B1.1, Application Note 1(I) as "injury . . . requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  At the scene of the crime, the Choctaw police officer determined that Lee Jim needed to be taken to the hospital because of his physical condition.  It is undisputed that he remained hospitalized overnight with a variety of medical complaints.

35

Further, § 1B1.1 Application Note 1(I) also instructs that "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242. Cotton was convicted under 18 U.S.C. § 2242, which is captioned "Aggravated sexual abuse."

Inconsistently, however, § 2A3.1 Application Note 1, explains that the term "serious bodily injury," for that section "means conduct other than criminal sexual abuse, which already is taken into account in the base offense level." It is not clear how this inconsistency is to be worked out. Nonetheless, in the present case there was additional evidence, other than the rape, that Jim's face was swollen as though he had been beaten and this is sufficient for the two-level enhancement for inflicting serious bodily injury.[10] Therefore, the district court did not err in enhancing Cotton's sentence for causing serious bodily injury.

A sentencing court is required to make particularized findings on any disputed issue arising from the Presentencing Report ("PSR"). United States v. Hooten, 942 F.2d 878, 881 (5th Cir. 1991). Cotton disputed the PSR's classification of Lee Jim as a vulnerable victim and its recommendation that Cotton's sentence be

---

[10] Cotton cites United States v. Guy, 282 F.3d 991, 997 (8th Cir. 2002) (vacating a sentence and remanding to the district court to determine if there was serious bodily injury apart from the sexual abuse), for the proposition that his sentence cannot be enhanced. In Guy, unlike in the present case, the sexual abuse was not reported until months later and there was no independent evidence of serious bodily injury. Id. at 992.

36

enhanced two levels for victimizing a vulnerable person. The district court heard evidence at trial of Lee Jim's alcoholism, his inability to communicate with others, and his financially vulnerable condition. The court also heard testimony of Cotton forcing Jim to drink and then hitting Jim about the head, raping him, and leaving him face down with his pants around his ankles covered in flour and milk. Further, Cotton himself offered testimony that he had humiliated Lee Jim for fun on previous occasions. Also, the court observed at sentencing:

> The Court heard testimony in the case relative to the victim, Mr. Jim, [and] had an opportunity to observe him. I think the proof in the case was the defendant himself admitted on previous occasion he pulled [Mr. Jim's] pants down, admitted he shaved his eyebrows and whatnot. That just doesn't sound to me like a man who can fend for himself.

Accordingly, the district court did make particularized findings to support the enhancement for victimizing a vulnerable person and the record as a whole supports these findings as plausible. Therefore, the district court did not err in enhancing Charles Cotton's sentence and the entirety of the sentence is affirmed.

Finally, both Bell and Cotton raise a final issue, claiming that due to the numerous errors made by the district court there was cumulation of error denying each a fundamentally fair trial. These arguments are essentially a summation of Bell's and Cotton's arguments concerning the other issues on appeal and some additional complaints as to the appropriateness of closing argument statements

made by the prosecution that Appellants often tried to humiliate the victims.

The cumulative error doctrine provides relief only when constitutional errors so "fatally infect the trial" that they violated the trial's "fundamental fairness." Derden v. McNeel, 978 F.2d 1453, 1457 (5th Cir. 1992) (en banc). Appellants' cumulative error arguments are rejected because we have determined the district court did not err or, alternatively, whatever errors did occur were harmless. Further, the evidence presented to the juries was found to be sufficient and Appellants had ample opportunity to point out any insufficiency. Finally, any statements made about Appellants in closing arguments, although potentially unflattering, were not false and were in fact supported by the evidence submitted to the jury. See United States v. Ivy, 929 F.2d 147, 153 (5th Cir. 1991) (holding that unflattering characterizations of the defendant do not require a new trial when such descriptions are supported by the evidence). Therefore, there was no cumulative error.

CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, for the reasons set forth above, we affirm the convictions and sentences of Bell and Cotton. The decisions of the district court in regard to Appellant J.D. Bell are affirmed because the district court did not err in

allowing Bell's confession to be introduced into evidence or in allowing Pauline Cotton to serve as interpreter for George Cotton at Bell's trial. Therefore, the jury verdict convicting Bell is affirmed. Likewise, the decision of the district court in allowing Pauline Cotton to serve as interpreter for George Cotton at Charles Cotton's trial is affirmed. The decision of the district court in allowing portions of J.D. Bell's statement to be admitted at Charles Cotton trial, however, was error and violated Cotton's Confrontation Clause rights. This error, however, was harmless and therefore the jury verdict convicting Cotton is affirmed. Finally, we also affirm the district court's sentencing of Cotton because the district court properly applied the Sentencing Guidelines and did not abuse its discretion in enhancing Cotton's sentence.

**AFFIRMED.**

**DENNIS, Circuit Judge, concurring in affirming the conviction and sentence of J. D. Bell, but dissenting from the affirmance of the conviction and sentence of Charles Cotton.**

I concur in the affirmance of the conviction and sentence of J. D. Bell and join fully in the panel opinion with respect to his case.

I respectfully dissent from the majority's affirmance of the conviction and sentence of Charles Cotton. The majority's opinion with respect to Charles Cotton is correct and well done in every respect except its determination that the violation of Cotton's constitutional right under the Fourteenth and Sixth Amendments to be confronted with the witnesses against him was harmless error.

When there is a violation of a criminal defendant's federal constitutional right, the court of appeals must reverse the conviction and sentence unless the government proves beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial. *Chapman v. California*, 386 U.S. 18, 24 (1967). A Confrontation Clause violation is not harmless unless "there [is] no reasonable possibility that the tainted evidence might have contributed to the jury's verdict of guilty." *Lowery v. Collins*, 988 F.2d 1364, 1373 (5th Cir. 1993); *Chapman*, 386 U.S. at at 23-24.

Judged against these standards, the Confrontation Clause violation in this case was not harmless. There is a reasonable

-40-

possibility that Bell's statement might have contributed to the jury's guilty verdict. The district court overruled the defendant's objection and permitted the prosecution to present the testimony of Officer Sypniewski that Bell had given the police a written statement in which he admitted bringing whiskey to Lee Jim's house and raping George Cotton there. This statement, which was against Bell's penal interest, tended to corroborate Lee Jim's testimony that after he, George Cotton, Bell, and Charles Cotton had imbibed of the whiskey which Bell and Charles Cotton brought to Lee's house, Charles Cotton raped Lee Jim, while Bell raped George Cotton. The statement of Bell, as testified to by officer Sypniewski, flatly contradicted the testimony of Charles Cotton and his wife Phyllis, who both stated that neither Charles Cotton nor Bell entered Lee Jim's home, brought whiskey there, or drank with Lee Jim or George Cotton there on the day of the alleged rapes.

Further, the impact of the statement was not insignificant, but rather was magnified, in light of the evidence or lack of evidence at trial. The prosecution was unable to introduce any medical or physical evidence that Lee Jim had ever been raped. Thus, without the unconstitutional introduction of Bell's statement, the prosecution would have been forced to rely solely on the testimony of Lee Jim and George Cotton to prove the rape allegations. George Cotton's speech impediment and the drunkenness of both him and Lee Jim at the time of the alleged crime significantly impaired their ability to provide clearly credible

-41-

eyewitness testimony directly tending to show that Charles Cotton raped Lee Jim.

Lee Jim, a self-acknowledged alcoholic, admitted that he was intoxicated on the day and at the time of the alleged rape. In fact, he was in such a state of intoxication that during the 45 minutes when Millie Chickaway, Clay Wesley, and Chris John were in his home, he did not stir from the prone position in which he was found. Further, although he was taken to the hospital soon after the alleged incident to have other injuries tended to, the prosecution introduced no evidence that he complained of rape that night. He did not complain of rape until more than a week after the incident, too long afterwards for a doctor to determine whether there had been medical evidence of a rape on the night in question.

George Cotton is a deaf-mute who was also intoxicated the day of the incident. He was forced to convey his evidence through his own improvised hand signals to his sister, Pauline Cotton, because he does not know any recognized form of sign language. Because she was deficient in English, Pauline Cotton's interpretation of George Cotton's hand signals had to be conveyed in Choctaw to a Choctaw-English translator. Pauline Cotton admitted before the jury that she was a biased witness and defense witness Junior Cotton testified that her translation was inaccurate and that several times she coached George as to the signaled answers he should provide. Although the district court did not abuse its discretion in allowing the prosecution to use Pauline as an interpreter,

-42-

George Cotton's sui generis deaf-mute sign language, the doubt cast upon the veracity of Pauline's translation of it into Choctaw, and George Cotton's drunkenness at the time of the alleged offense would allow a reasonable jury to discount his testimony.

The testimony of the remaining three witnesses, Chickaway, Wesley, and John did not add much, if anything, to the prosecution's case. These witnesses arrived at Jim's home sometime *after* the alleged unlawful conduct occurred. Although they were able to testify that Lee Jim was found in a prone position, none of these witnesses could place Charles Cotton at the alleged crime scene, much less testify that Charles Cotton raped Lee Jim.

Considering the foregoing frailties in the prosecution's evidence, without Bell's statement which flatly contradicted the testimony of Charles Cotton and his wife and placed him at the scene at the time of the alleged crime, the prosecution's case against Charles Cotton would have been much weaker. There was no medical evidence that a rape had occurred, there was no physical evidence placing Charles Cotton inside Lee Jim's home, and there was no clearly credible eyewitness testimony as to what occurred in Lee Jim's home on the day of the alleged incident.

The government must prove that the error was harmless beyond a reasonable doubt, meaning that there is no reasonable possibility that the tainted evidence might have contributed to the jury's verdict of guilty. Considering the weaknesses in the prosecution's

evidence, I do not believe the government has proven beyond a reasonable doubt that the unconstitutional admission of Bell's statement was harmless.  On the contrary, I think there clearly is a reasonable possibility that the tainted evidence might have made the difference in at least one juror's vote and therefore might have contributed to the verdict of guilty.