# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00281-CR

---

**Patrick Mark Love, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 21-0194-K368
### THE HONORABLE SARAH SOELDNER BRUCHMILLER, JUDGE PRESIDING

---

## O P I N I O N

A jury convicted appellant Patrick Mark Love of continuous sexual abuse of a young child and assessed his punishment at life imprisonment. *See* Tex. Penal Code § 21.02(b). In six issues, Love challenges the trial court's jury instructions and contends that the court abused its discretion by admitting extraneous-offense evidence. We affirm the trial court's judgment of conviction.

## BACKGROUND

The State alleged that Love abused his adopted daughter, Rebecca Turner,[1] on multiple occasions from September 1, 2007, through March 31, 2009. At trial, the State offered

---

[1] Because Turner and her friend, Stephanie Mitchell, were minors at the time of the offense, we refer to them by pseudonyms in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

testimony from Turner; her mother, therapist, friend, and employer; Williamson County Sheriff's Office (WCSO) Detective Joshua Whinnery; and sexual assault nurse examiner (SANE) Deborah Kleypas. Love testified on his own behalf and called as witnesses his wife, mother, brother, friend, and ex-fiancée. The State's exhibits included a cellphone video depicting Turner and her friend, Stephanie Mitchell, drinking with Love and an audio recording of a call between Love and Turner.

Turner, who was 27 years old at the time of trial, testified that Love, then 49, abused her from the ages of five to 17. She framed the abuse by referencing the addresses at which her family had lived: Mormon Mill Road in Marble Falls, Texas, from 1999 to 2002; Speed Horse in Liberty Hill, Texas, from August 2002 to March 2006; Elk Mountain Trail in McKinney, Texas, from March to December 2006; Polo Pony in Liberty Hill from December 2006 to December 2009; and North Highway 281 in Lampasas, Texas, from December 2009 to March 2010. Love also abused her at his apartment in Cedar Park, Texas, around 2010 or 2011.

Love began dating Susan Walker, Turner's mother, in April 1999, and Walker and Turner moved into Love's home on Mormon Mill Road that summer. Love married Walker on New Year's Day 2000 and adopted Turner soon after. While the family lived at the Mormon Mill residence, Love would "rub [Turner's] butt or [] thighs" and play "peekaboo," which she described as a game in which he would look down her shirt or "try to look at [her] private parts."

The family moved to the house on Speed Horse when Turner was approximately six years old. Love was very controlling and did not allow her to talk to boys. He "sexually abuse[d]" her at least five times while they lived at the house, and the abuse included oral sex, anal rape, inappropriate touching, and vaginal penetration with sex toys. Love would also use a

2

"sex pillow" and lubricants during the abuse. On two or three occasions, he threatened to kill Turner and Walker if Turner told anyone about the abuse; later he would say only, "You know what will happen if you tell anyone." Nevertheless, when in first grade, Turner told Walker that Love had "cheated on her . . . with me," but Love convinced Walker that Turner was merely having nightmares.

Although the nature of the abusive acts did not change, the abuse began to occur every month when the family moved to McKinney. Turner testified that while they were living there, Love on one occasion shaved her legs and vagina.

The assaults alleged in the indictment occurred after the family moved to the house on Polo Pony in 2006, when Turner was approximately 11 years old. The abuse was "most frequent" at that house, occurring weekly or biweekly, and included "sex," the term Love used to refer to his rubbing his penis between Turner's thighs; anal rape; inappropriate touching; "[o]ral sex on both sides"; and the use of sex toys. When Love rubbed his penis between her thighs, it would touch her vagina. He abused her for his pleasure and to punish her and would touch and penetrate her vagina with his fingers and touch her chest with his hands. He was "still pretty good about hiding it" and would initiate the abuse when Walker was not at home. The anal rape occurred so often that Turner began to feel numb to it and would "just let it happen and hope that it would finish fast." Love also showed her pornographic videos and made her "reenact them afterwards." The abuse occurred throughout seventh and eighth grade and during the first semester of ninth grade. Turner wrote a paper about sexual abuse in eighth grade because she "wanted someone to hear [her]," "to know what was going on," and for Love "to stop."

It was also on Polo Pony that Love began allowing Turner to drink alcohol and keeping drinks in a refrigerator and closet for her and Mitchell. When Turner and Mitchell entered seventh grade, Love started making them mixed drinks, and there were times that Turner blacked out from drinking too much. Turner recalled that during one night of drinking, Mitchell ran into a pillar and fell down. When Mitchell awoke in a bathtub the next day, she was wearing only a bra and shorts and had a hickey on her neck. Turner also recounted that Love would bring Turner pain medication and alcohol and touch her inappropriately while she was impaired.

Turner next detailed the abuse that she suffered following the family's move to Lampasas in December 2009. The abuse occurred with "about the same" frequency as on Polo Pony and consisted of many of the same acts. Love continued to provide Turner and Mitchell with alcohol, sometimes mixing Benadryl into their drinks, and began to supply marijuana to Turner and her friends. If Turner wanted something, Love would make her perform a sex act in exchange for it. Walker was never present for the abuse.

Two specific incidents stood out to Turner. In the first, Love gave her and Mitchell massages when they were shirtless. They woke up the next day in his underwear and t-shirts, and Turner could not remember what had happened after the massages. The other incident involved Love giving Turner strawberry daquiris and Benadryl. Much of her memory was "blacked out," but she remembered "pink throw up everywhere" and his raping her vaginally in his bedroom while wearing a condom. The following day, she asked Walker for help but did not disclose the rape. Turner remained silent because Love "had a lot of friends in law enforcement," and she did not know who she could trust.

After Walker and Love separated, Turner "had to go back and forth" between their residences, and he abused her "every time [she] was with him." Following the couple's

4

divorce around Turner's sophomore year of high school, Love moved into an apartment in Cedar Park, but "any time [she] would go over, abuse would happen." Love continued to give Turner alcohol and marijuana during this time.

The abuse ended when Turner was approximately 17 years old. Although Love tried to abuse her when she and Mitchell visited him after he moved to Colorado, he stopped after Turner warned that she would scream if he tried anything. Turner saw Love twice after the Colorado trip, once at her high school graduation and again when her son was born in 2016. She testified that she had invited him to visit on both occasions and had been excited to see him.

In 2017, Turner disclosed the abuse to Marci Ferguson, Turner's employer with whom she was living at the time. Around June of 2020, Turner publicly posted on social media that she had been abused from "ages 4 through 17, 21 and 24." That December, she reported the abuse to law enforcement, who arranged a call between her and Love. While the first attempt, conducted in officers' presence, failed because she did not have Love's current phone number, he called her after she reached out to him on Facebook, and she recorded the call using her work cellphone. During the call, Love repeatedly apologized, begged Turner not to tell anyone about the abuse, stated that he had been "messed up" but was "not that way anymore," and offered to kill himself if Turner wanted him to do so.

After making the 2020 police report, Turner told Walker about the abuse for the first time since her first-grade outcry but did not go into detail. Turner testified that she had coped with the abuse by drinking and using drugs, including cocaine and ecstasy, but was sober at the time of trial.

Taralynn Robinson, Turner's therapist, testified about Turner's diagnoses and treatment as well as common features of child abuse and abusers. Robinson began treating

5

Turner in 2020 and although Turner had been stable in the year before trial, she had initially suffered from depression, anxiety, panic attacks, stomach pain, loss of appetite, nightmares, insomnia, and "fear of going out into the world and being around people." Robinson diagnosed Turner with post-traumatic stress disorder. Turner revealed to Robinson that she had been abused by Love from ages four to 15 and provided details of the abuse, which Robinson testified amounted to a "continued pattern over years." While Turner had additional stressors in her life, including harassment by an ex-boyfriend, the death of another partner, and "issues with interpersonal relationships," the "primary trauma" with which she and Robinson dealt was "[t]he child sexual assault." Robinson testified that in her training and experience, Turner's symptoms and disclosures were consistent with those of someone who had suffered childhood sexual trauma.

Turner experienced suppression and dissociation among her symptoms. By "suppression," Robinson meant that Turner remembered the abuse, "but she was trying to push it away." Robinson defined dissociation as a coping mechanism used by victims of child sexual assault, which involves the "separation from mind and body" and can include "hours or days of not remembering what is happening, having memory loss, forgetting appointments, forgetting important events in life." She also testified that dissociation "can be related to someone's perceptions of fantasy and reality or what happened in fact and what happened just in the mind." As a result of her dissociation, Turner would miss appointments and reported some memory loss.

Robinson had Turner take a Dissociative Experiences Scale (DES-II) assessment to measure her level of dissociation. Although not a formal assessment, the DES-II consists of "a series of questions that the clinician gives to the patient, [who] self-report[s] how often they may experience certain things . . . and talk[s] about the percentage of time certain things

6

happened to them." Robinson testified that while Turner's score was high, "it wasn't so high that [Robinson] needed to administer another more formal assessment." Regardless, Robinson had no concern that Turner's account was fabricated because of the level of detail she provided and her affect during their sessions.

Robinson testified that abuse victims make delayed outcries because "it's hard for the victim that's experiencing abuse to report it when it's happening because of freeze response often; the body shuts down." "Most all" of her patients do not report their abuse to authorities, and in her experience people do not want to believe that abuse has occurred. Regarding victim behavior, Robinson testified that victims of child sexual abuse can "hold some sort of love or good feelings for the abuser"; "act out in ways of increased sexual activity, addiction, drinking, eating disorders, having trouble keeping jobs, [and] having trouble concentrating"; make "piecemeal" outcries; manifest their trauma through bedwetting or chronic illness; or disclose abuse "in a way that's not clear, that's confusing to the person that it's being told to."

Robinson explained that "grooming" begins when an abuser offers a child something that makes the child feel special, possibly including, as the child ages, "offering them alcohol or letting them have parties, manipulating them, showing them porn, teaching them about sex." The purpose is to "establish a different connection so that the victim thinks that it's okay and it's normal." An abuser is commonly someone that the child knows or who is in a position of authority over the child. The abuser can isolate or control access to the child and may use threats, bribes, or manipulation to keep a child from disclosing abuse. Abusers may also use sexual abuse as a form of punishment; "[o]ften, . . . if the child has acted out or done something wrong, then they are punished with some type of sexual act or shown pornography."

7

Walker testified that she had wanted Love to adopt Turner and that as part of the adoption process, a home study was performed. Walker testified that she asked Love for a divorce in January 2010, when the family was living on North Highway 281 in Lampasas, and filed for divorce that March as she and Turner were moving out. She also testified that during the divorce, Turner sometimes wanted to visit Love and sometimes did not. Walker further testified that although Turner initially lived with Walker and would visit Love, a custody agreement was reached in 2011 that split custody evenly between Walker and Love.

Walker testified that she did not witness "anything physical" or observe any "sexual behavior" between Love and Turner during the marriage. However, she also testified about an outcry that Turner made as a young child as well as about Love's "behaviors that were a red flag" when Turner was entering puberty. Walker testified that she had never discussed the "specifics" of the abuse with Turner.

When the family lived on Speed Horse, Walker and Love were watching Law and Order: Special Victims Unit (SVU), a TV show involving sexual crimes, when Turner came into the room and said that "her daddy had hurt her." Walker asked what she meant, and Turner reiterated, "He hurt me and he took me away." Turner then began "recalling some of the episode" that Walker and Love had been watching. Although to Walker's knowledge, Turner had not been watching, she was "remembering a TV show" and "[s]aying that the events depicted in the TV show happened to her." Love grew upset and denied having done anything, so "nothing happened of that." Walker did not suspect that any abuse had occurred.

Despite being "on guard," Walker "never saw anything happen." But while the family was living in McKinney, an incident occurred that "punched [her] in the gut" and "didn't seem right." Love had insisted on showing Turner—who was 10 or 11 at the time—how to

8

shave her legs, something Walker believed to be Walker's responsibility. After the family moved to the house on Polo Pony, she observed "more behaviors and things that bothered [her]," including Love's giving Turner alcohol and cigarettes. When Walker confronted him about photographs that she had found on Turner's phone that showed her and her friends drinking, Love replied, "I'm an adult. I can do what I want to do." In 2011, she found a video recording of Turner and Mitchell drinking with Love and reported it to the Texas Alcoholic Beverage Commission (TABC). Walker and Love also fought over Turner's clothing, and Walker testified, "Preteen, teen years, he approved of her wearing short shorts, midriff shirts, things like that. It was a constant battle because I was more conservative."

Walker recounted two further incidents in detail, the first of which was "a huge red flag." In February 2010—approximately one month after she asked Love for a divorce—she caught him outside their house looking through a window into a bathroom where Turner was getting ready for school. He was "standing kind of crouching down looking up into the window," which was propped open approximately two inches by a bobby pin. Walker asked him "what the hell he was doing," and he responded, "No, I'm not doing anything. I'm not doing anything." She went to check on Turner, who was not fully dressed. Walker subsequently reported the incident to the Burnet County Sheriff's Office, and while there was an investigation, no charges resulted.

The second incident occurred in 2011 when Turner told Walker that she had thrown up "red stuff" and that Love had refused to take her to the hospital. Walker called Love, who said that Turner was "just fine." When he took Turner to a movie later that day, Walker called the police, who met Turner in the theater's bathroom and escorted her to Walker's house.

9

Walker testified that she and Love had a foam "body wedge" and lubricants and creams that they kept in the primary bedroom for use in their sexual relationship. She testified that Turner had bedwetting issues from ages five to eight as well as problems with incontinence at school. Walker further testified that while the bedwetting subsided after the family moved to Liberty Hill, Turner developed stomach problems, headaches, and stress. Walker also testified that Turner required birth control to help regulate pain and discomfort in her menstrual cycles but that Love objected to her having "yearly womanly exams" and being put on birth control, telling Walker that Turner was too young.

Mitchell testified about her friendship with Turner and Love's giving them alcohol starting when they were approximately 13 or 14. Turner is Mitchell's best friend and "like a sister to her." As children, they would drink "quite a bit" and got drunk a few times. They would hang out and, after Walker fell asleep, Love would offer them alcohol or make them strawberry daquiris.

Mitchell recalled twice blacking out from drinking too much. The first time happened when Turner's family lived in Liberty Hill. Mitchell remembered running into a wall and regaining consciousness in a bathtub with a bruise on her neck and wearing "a bra with a towel over [her]." She had thought the bruise was from hitting the wall, but her boyfriend believed it to be a hickey. Turner had recorded a cellphone video of Mitchell drinking next to Love. Mitchell did not remember the video being recorded but thought that they had been at the house of Love's ex-girlfriend, who Mitchell later learned was one of her teachers. Mitchell next blacked out at Turner's house in Lampasas. Mitchell woke up wearing men's underwear and remembered that Love had massaged her and Turner in his bedroom. He had been the only man living in the house.

10

Mitchell testified that prior to learning of the abuse in 2021, she had had "no idea, no signs, no nothing" and that the only red flag had been Love's offering them alcohol. She testified that she and Turner had not discussed the details of the abuse because it was hard for Turner to talk about. Mitchell also testified that learning that Turner had been abused helped to explain Turner's unhealthy relationships with men as an adult.

WCSO Detective Whinnery testified that he had accompanied the lead investigator in the case, Detective Larry Hawkins, during an attempt to interview Love in person. Detective Hawkins had attempted multiple times to reach Love by phone but had been unsuccessful.

Kleypas, the SANE, testified that she did not perform a head-to-toe examination or sexual assault forensic examination because Turner's alleged abuse occurred years earlier. She also testified that although genital examinations are not generally performed as part of teen physicals, she would expect a physician to ask about sexual history during a visit to obtain birth control.

Ferguson testified that Turner had been her employee and had moved in with her around 18 to become "in so many ways" her "adopted daughter." She testified about an outcry that Turner had made during an argument they had when Turner was approximately 19. Turner, who had given birth to a son after moving in with Ferguson, "seemed like she had a lot of hatred, especially towards women." Turner would be "fine" but then would "just shut down" and go to her room or want to leave. She "put up a lot of flags that something was wrong with her, that something has happened to her and that's why she's putting her guard up." During the fight, it seemed like Turner wanted to tell Ferguson something, so Ferguson "grabbed her and [] basically told her, 'What has happened to you that you are acting out like this? Like, why do you

11

hate women so much? Why are you always putting men on a pedestal?'" Turner, without going into detail, told Ferguson that Love had molested her "several times" when she was six or seven and that she had a lot of anger toward him. Ferguson had thought that it was too late to report the abuse to police but could tell that "there was hurt" and that there were certain incidents about which Turner did not wish to speak.

Love testified on his own behalf, denied the allegations against him, and challenged both Turner's credibility and his opportunity to abuse her. He had been a "father figure" to her, and after his and Walker's divorce, Turner had told his attorney that she preferred living with Love, resulting in the custody agreement's amendment. Love worked long hours during the period of the alleged abuse and would often be at work by 5 or 6 a.m., hours before Walker—who rarely traveled—left the house. When the family lived on Polo Pony and North Highway 281, his mother lived nearby and helped care for Turner. Turner played sports, visited friends, and went to school and the doctor's office; "during all those times, [he] would not have any control over her," and could not have "prevent[ed] her from saying anything to any of those people about any topic." He had no friends or associates in law enforcement and had "adult, healthy sexual relationship[s]" with Walker and an ex-girlfriend, Christine Riddick. He and Walker watched SVU daily, and Turner was "aware of" the show by at least kindergarten.

Love and Turner continued to be close after the divorce. Although both of them likely came up with the idea of her visiting him in Colorado, she and Mitchell ran up and hugged him at the airport. Turner also tried to visit him in Florida in 2018. After graduating from high school, she thanked him, gave him her diploma, and sat next to him at a celebratory dinner. She called him from the delivery room after giving birth to her son, who Love soon came to see.

12

Love testified in greater detail regarding certain allegations. Although he had given alcohol to Turner and Mitchell on occasion to be the "cool dad" and ensure that they were drinking in a safe environment, he had only made them mixed drinks once. When asked how many times the girls had gotten drunk, he identified a single instance in which Mitchell had run into a wall and thrown up on herself. He did not help her clean her clothes afterward. While the cellphone video of Turner and Mitchell drinking with him—in which Turner yelled, "Chug, chug, chug"—was recorded on a separate occasion, he testified that neither girl appeared drunk in the video. He had been aware that Turner and Mitchell were sneaking drinks from the refrigerator and pantry, but he and Walker put up the alcohol.

Love testified that Turner and Walker had lied about his having shaved Turner's legs. He also testified that when Walker allegedly caught him peeping on Turner in February 2010, he had been feeding the family's animals, had not been looking in the window, and would have been unable to do so because the bottom sill was approximately six feet off of the ground, and he is 6'2".

The night before the 2011 theater incident, Turner told Love that she was feeling unwell. She came into his bedroom after he fell asleep, sat on his knees, and asked to sleep with him. He told her that it would be inappropriate and to go back to her own bed. The next day, she asked him what had happened the night before, and he responded that she had been feeling unwell and had come into his room. She explained that she had mixed up her medications and had taken too much. During the movie, she went to use the restroom but did not return. On leaving the theater, he listened to a voicemail from the Marble Falls Police Department, in which an officer informed him that Turner was "in the custody of her mother about an alleged sexual assault that happened last night. She's okay. We didn't want you to be concerned." Police

13

never followed up with Love, but he no longer allowed Turner to stay with him overnight or on weekends "to protect [him]self." When Love was living in Colorado, Turner again asked him whether anything had happened that night; he replied that nothing had, and she told him, "I didn't think it did, but, you know, [Walker] kind of pushed it – tried to push me in that direction."

Love also testified about the call with Turner in December 2020. At the time, his wife Deborah—who is approximately one week older than Turner—was pregnant with their second child and depressed, on bed rest, and under instructions to avoid stress. Both he and Deborah had been suffering from a lack of sleep, and he had wanted to protect his wife and child. He had been aware of Turner's June 2020 social media posts alleging abuse but had thought she was referring to the theater incident.

When Turner called, he was at a construction site for work and did not make an "outright denial" because "[i]t would have led to [Turner] getting upset, calling [Deborah] all the time . . . . [T]hey were already on bad terms through social media." He apologized to Turner "to appease her in the moment" and "give her some type of peace" because he knew about "all the other problems that she's had." He told her what she "wants to hear to keep her from escalating the situation to law enforcement, again, or [Deborah, who was] pregnant at the time." Similarly, he told Turner he had been "messed up" and that he was contemplating suicide only to try to "relate to her at the time." Although he had been to therapy, it had not been because he abused Turner. He thought that that he did a good job "faking the emotion" on the call.

Love's ex-girlfriend Riddick; mother Sandra; brother Michael; and friend, Clay Burton, testified that they had observed Love and Turner's relationship but had not noticed anything suspicious, unusual, or inappropriate. Riddick testified that Love and Turner had "a

14

normal father-daughter relationship." Although Riddick testified that she taught Mitchell, she had not done so while she was dating Love. Riddick testified that the cellphone video of Love, Turner, and Mitchell drinking might have been recorded at her house, but she was not sure. Sandra testified that she felt that Turner had the ability to open up and talk to her. And Michael testified that he had driven Turner and Mitchell to and from the airport on their Colorado trip; that both had seemed excited and in good spirits; and that after graduating, Turner had walked past other family members to hug and thank Love.

The jury convicted Love of continuous sexual abuse of a young child. During the punishment hearing, the State emphasized the evidence admitted during the guilt-innocence phase of trial, and Turner testified about the impact of the offense on her life. While deliberating, the jury submitted a note asking if there were "a possibility of parole with [Love's] sentence." The trial court answered that all applicable law was contained in the court's charge, and the jury assessed a punishment of life imprisonment, which the trial court followed.

## DISCUSSION

Love raises six issues on appeal. In four issues, he contends that the trial court committed jury charge error by (1) providing incorrect definitions of the relevant culpable mental states, (2) omitting a culpable mental state from the application paragraph, (3) providing an erroneous limiting instruction regarding the admissibility of extraneous-offense evidence under article 38.37 of the Texas Code of Criminal Procedure, and (4) failing to provide a statutorily-mandated parole instruction. Love also contends that the court abused its discretion by admitting Turner's unfairly prejudicial extraneous-offense testimony and by denying his request for a contemporaneous limiting instruction at the time the testimony was admitted.

15

## I.   Charge Error

### A.   Standard of Review

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Tex. Code Crim. Proc. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018); *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017), *superseded by statute on other grounds*, Melissa's Law, 2019, 86th Leg., R.S., ch. 738, § 2, sec. 22.011(f), 2019 Tex. Sess. Law Serv. 2050, 2051 (codified at Tex. Penal Code § 22.011(f)(2)), *as recognized by Lopez v. State*, 600 S.W.3d 43, 46 (Tex. Crim. App. 2020).   The jury charge should tell the jury what law applies and how it applies to the case.   *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).   The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge.   *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (citing *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011)).   The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions."   *Mendez*, 545 S.W.3d at 552 (quoting *Delgado*, 235 S.W.3d at 249).

We review alleged jury charge error in two steps:   first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal.   *Arteaga*, 521 S.W.3d at 333; *see Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g 1985)).   When, as here, the defendant does not make a timely objection during the proceedings below, we must determine whether the record establishes that the error caused him "egregious harm."   *See Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020).   "Neither party bears a burden of production or persuasion with respect to [the] harm analysis, the question being

16

simply what the record demonstrates." *Hollander v. State*, 414 S.W.3d 746, 749–50 (Tex. Crim. App. 2013) (citing *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008)).

Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Gonzalez*, 610 S.W.3d at 27; *see also Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019) (stating that egregious harm occurs when the error "created such harm that the appellant was deprived of a fair and impartial trial"). The appellant must have suffered actual, and not merely theoretical, harm. *Gonzalez*, 610 S.W.3d at 27. In determining whether egregious harm exists, we must evaluate the entire record in light of four factors: 1) the complete jury charge; 2) the arguments of counsel; 3) the entirety of the evidence, including the contested issues and weight of the probative evidence; and 4) any other relevant factors revealed by the record as a whole. *Id.*; *Hollander*, 414 S.W.3d at 749–50 (citing *Almanza*, 686 S.W.2d at 171). In some instances, however, a single consideration may persuade a reviewing court that the risk of harm is so minimal that it precludes a finding of egregious harm. *Gonzalez*, 610 S.W.3d at 27 (citing *French v. State*, 563 S.W.3d 228, 239 (Tex. Crim. App. 2018)).

**B.      Omission of Culpable Mental State from Application Paragraph**

"Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). The charge's application paragraph is the "heart and soul" of the charge and "applies the pertinent penal law, abstract definitions, and

general legal principles to the particular facts and the indictment allegations" of the case. *Id.* at 366–67.  A charge is adequate

> if it either contains an application paragraph specifying all of the conditions to be met before a conviction under such theory is authorized, or contains an application paragraph authorizing a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs.

*Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by*

*Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997).

The application paragraph in this case instructed the jury:

> Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 1st day of September, 2007, through on or about the 21st day of November, 2009, in Williamson County, Texas, the defendant, PATRICK MARK LOVE, did then and there during a period that was 30 or more days in duration, when the defendant was 17 years of age or older, commit two or more acts of sexual abuse against [Turner], a child younger than 14 years of age, namely, by committing Aggravated Sexual Assault of a Child by causing the sexual organ of the defendant to contact or penetrate the anus of [Turner], by committing the offense of Aggravated Sexual Assault of a Child by causing the defendant's sexual organ to contact the sexual organ of [Turner], by committing the offense of Aggravated Sexual Assault of a Child by causing the defendant's sexual organ to contact or penetrate the mouth of [Turner], or by committing the offense of Aggravated Sexual Assault of a Child by causing an object; to-wit, sex toy, to contact or penetrate the sexual organ of [Turner], then you will find the defendant guilty of Continuous Sexual Abuse of a Young Child, as charged in the indictment.

> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

The paragraph's language tracked the indictment, which in turn substantively tracked the language of the continuous-sexual-abuse statute. *See* Tex. Penal Code § 21.02.

18

We address Love's second issue at the outset for the sake of clarity. In this issue, Love contends that the trial court erred because the application paragraph "failed to require any culpable mental state whatsoever." This failure, he argues, rendered the charge fundamentally defective and allowed the jury to convict him without finding that the State had proven all elements of the offense beyond a reasonable doubt.

In support of his contention, he cites *Doyle v. State*, a plurality opinion from the Court of Criminal Appeals that stated:

> It is now axiomatic that an application of the law to the facts of the case, in the trial court's charge to the jury, which omits the culpable mental state alleged in the charging instrument, will render that charge fundamentally defective, and require reversal of the conviction by this Court, or an intermediate appellate court of this State, should the cause be appealed. This is true even though the trial court's charge to the jury properly includes therein the alleged culpable mental state in the abstract or definitional part of the charge.

631 S.W.2d 732, 737–38 (Tex. Crim. App. 1980) (plurality op.) (internal citations omitted).

Love's reliance on *Doyle* is misplaced. First, the validity of the opinion, which is non-binding, has since been called into doubt. *See Barrera v. State*, 982 S.W.2d 415, 416–17 (Tex. Crim. App. 1998) (recognizing that *Doyle* was pre-*Almanza* case that overemphasized importance of procedurally perfect jury charge and application paragraph in particular). Second, the charge in this case did not omit a culpable mental state alleged in the indictment nor an essential element of continuous sexual abuse of a young child.

The indictment and application paragraph lacked a culpable mental state because continuous sexual abuse of a young child has no mens rea element of its own; "[t]he applicable culpable mental states are those required for the commission of the constituent offenses." *Payton v. State*, No. 14-22-00598-CR, 2024 WL 3983282, at *2 (Tex. App.—Houston [14th

19

Dist.] Aug. 29, 2024, no pet.) (mem. op., not designated for publication). Moreover, these predicate offenses "are not themselves elements of the offense, but are merely evidentiary facts, the manner and means by which the actus reus element is committed." *Jacobsen v. State*, 325 S.W.3d 733, 737 (Tex. App.—Austin 2010, no pet.).

Although this Court has never addressed the issue in the continuous sexual abuse context, *see id.* (concluding that issue was not preserved), we agree with our sister courts that subsection 21.02(b) "does not require general mental culpability beyond the mental culpability required for its constituent offenses," *Williams v. State*, No. 02-20-00104-CR, 2021 WL 5227167, at *3 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op., not designated for publication); *see, e.g.*, *Buxton v. State*, 526 S.W.3d 666, 684 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Lane v. State*, 357 S.W.3d 770, 776–77 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see also Casey v. State*, 349 S.W.3d 825, 829 (Tex. App.—El Paso 2011, pet. ref'd) (listing elements of continuous sexual abuse of young child and omitting culpable mental state). In so doing, we also agree with those courts that have concluded that Texas Penal Code subsection 6.02(b)—mandating that a culpable mental state apply to an offense "unless the definition plainly dispenses with any mental element," *see* Tex. Penal Code § 6.02(b)—does not require that the State prove a separate culpable mental state for continuous sexual abuse of a young child, *see Colon v. State*, No. 13-19-00087-CR, 2020 WL 1467149, at *3 (Tex. App.—Corpus Christi–Edinburg Mar. 26, 2020, no pet.) (mem. op., not designated for publication); *Buxton*, 526 S.W.3d at 684; *Lane*, 357 S.W.3d at 776–77; *see also Jacobsen*, 325 S.W.3d at 739–40 ("The acts of sexual abuse alleged in the indictment were violations of statutes that themselves require a culpable mental state."). As the Fourteenth Court of Appeals has explained:

20

Section 21.02, however, is defined in terms of other acts that *by their terms* require a culpable mental state. *See* Tex. Penal Code § 21.02(c) (listing offenses which may underlie continuous sexual abuse). Section 21.02's express requirement that these acts be committed is therefore functionally indistinguishable from an express requirement of the mental state essential to their commission. Section 21.02 need not prescribe some additional mental state because its *actus reus* is merely the repeated commission of acts already requiring culpable mental states. It follows that section 6.02, which by its terms applies only to statutes that do not set forth a culpable mental state, is inapplicable to section 21.02.

Moreover, the legislature expressly prescribed additional intent elements for some of the subsidiary acts underlying continuous sexual abuse. That the legislature inserted language requiring a particular culpable mental state for some of these underlying acts, but did not add language assigning an additional culpable mental state to the offense of continuous sexual abuse as a whole, indicates that it did not intend to require an additional mental state.

*Lane*, 357 S.W.3d at 776–77 (internal citations omitted).

The charge instructed the jury that "bearing in mind the foregoing instructions," to convict Love of continuous sexual abuse of a young child, it had to find beyond a reasonable doubt that he had committed aggravated sexual assault of a child at least twice within a 30-day period. The abstract portion of the charge, which preceded the application paragraph, in turn provided that a person must act "intentionally or knowingly" to commit the offense of aggravated sexual assault of a child. Thus, when read as a whole, the trial court's charge was not erroneous for failing to include a culpable mental state in the application paragraph. *See Plata*, 926 S.W.2d at 304; *Colon*, 2020 WL 1467149, at *3; *Evans v. State*, No. 06-20-00035-CR, 2020 WL 6685038, at *5 (Tex. App.—Texarkana Nov. 13, 2020, pet. ref'd) (mem. op., not designated for publication). We overrule Love's second issue.

21

## C.     Culpable Mental State Definitions

In his first issue, Love contends that the trial court provided erroneous culpable mental state definitions in the abstract portion of the jury charge.

"Section 6.03 of the Texas Penal Code sets out: four culpable mental states—intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements—nature of the conduct and result of the conduct; and the effect of the circumstances surrounding the conduct." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *see* Tex. Penal Code § 6.03. A culpable mental state is not a conduct element; rather, the conduct element is what the culpable mental state applies to. *O'Brien v. State*, 544 S.W.3d 376, 386 (Tex. Crim. App. 2018). The language in a jury charge regarding culpable mental states must be tailored to the conduct elements of the charged offense, and a trial court errs when it fails to limit the language in regard to the applicable culpable mental states to the appropriate conduct element. *Price*, 457 S.W.3d at 441.

"'Result of conduct' offenses concern the product of certain conduct." *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011). "Nature of conduct" offenses, on the other hand, criminalize an act because of its nature, *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989), and the conduct is punishable "regardless of any result that might occur," *Young*, 341 S.W.3d at 423. Lastly, "'circumstances of conduct' offenses prohibit otherwise innocent behavior that becomes criminal only under specific circumstances." *Id.*

The gravamen of an offense—its gist, essence, substance, or substantial part—dictates which conduct elements are included in the culpable mental-state language. *Price*, 457 S.W.3d at 441. If an offense has multiple gravamina, the jury charge on culpable mental states must be tailored to the respective conduct elements. *Id.* For example, if "one gravamen is

22

the result of conduct and the other is the nature of conduct, the jury charge on culpable mental state must be tailored to both the result of conduct and the nature of conduct." *Id.* at 441–42 (citing *Hughes v. State*, 897 S.W.2d 285, 295 (Tex. Crim. App. 1994)).

To determine the gravamen or gravamina of an offense, we "look to the text of the statute to discern what the conduct elements are." *O'Brien*, 544 S.W.3d at 386. Statutory language generally determines whether a crime is a "result of conduct," "nature of conduct," or "circumstances of conduct" offense:

> A "result of conduct" offense generally requires a direct object for the verb to act upon: in the statutory language punishing murder, "causes" is the verb, and "death"—the result—is the direct object. Further, different subsections in a "result of conduct" statute may punish distinctly different acts that cause the same result, and it is the result rather than the specific act that is the focus of the offense. "Nature of conduct" offenses, on the other hand, generally use different verbs in different subsections, an indication that the Legislature intended to punish distinct types of conduct . . . . With an offense whose criminality depends upon the "circumstances surrounding the conduct," the focus is on the particular circumstances that exist rather than the discrete, and perhaps different, acts that the defendant might commit under those circumstances.

*Young*, 341 S.W.3d at 423–24.

As charged in this case, Texas Penal Code subsection 21.02(b) provides that a person who is at least 17 years of age commits the offense of continuous sexual abuse of a young child if, during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse against one or more victims younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense. *See* Tex. Penal Code § 21.02(b). The statute defines an "act of sexual abuse" as a commission of one of the offenses listed in subsection 21.02(c), including aggravated sexual assault. *See id.* §§ 21.02(c), 22.021.

23

In the abstract portion of the guilt-innocence jury charge, the trial court provided the jury with definitions of "intentionally" and "knowingly" tailored to a "result of conduct" offense. Love contends that the Texas Court of Criminal Appeals in *Ramos v. State* "provided controlling, published, definitive authority that the culpable mental state of [continuous sexual abuse of a child] is nature of conduct and the circumstances surrounding that conduct," *see* 636 S.W.3d 646, 656 (Tex. Crim. App. 2021), and that the court therefore erred by providing the result-oriented definitions, *see Wesley v. State*, 605 S.W.3d 909, 918 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (concluding that "it was error to include the 'result-oriented' portion of the culpable mental state definitions in the abstract portion of the court's charge" for nature-of-conduct offense).

The Court in *Ramos* held that "continuous sexual abuse of a child and prohibited sexual conduct are not the same offense for purposes of a multiple-punishments double-jeopardy analysis." 636 S.W.3d at 657. However, in analyzing the "sameness" of the offenses, the Court considered the factors listed in *Ervin v. State*, including whether the gravamina of the two offenses are the same. *See* 991 S.W.2d 804, 814 (Tex. Crim. App. 1999). As Love correctly notes, the Court explained that

> continuous sexual abuse of a child has a nature-of-conduct component: the repeated commission of sexual abuse . . . [and] several essential circumstance-surrounding-conduct components: that the victim of the repeated sexual abuse must be a child younger than 14 years of age, and that the instances of sexual abuse must occur over a period of at least 30 days in duration.

*Ramos*, 636 S.W.3d at 656.

The Court identified the gravamen of continuous sexual abuse of a young child as the nature-of-conduct component, stating that it was "not a particular instance of one of the

24

offenses listed in Section 21.02(c)" but rather "the commission of at least two such offenses." *Id.* Consequently, we conclude that continuous sexual abuse of a young child is a nature-of-conduct offense and that the trial court erred by tailoring the culpable mental state definitions to a result-of-conduct offense. *See Price*, 457 S.W.3d at 441.

Having concluded that the trial court erred, we must next determine whether that error egregiously harmed Love. *See Arteaga*, 521 S.W.3d at 333. He does not explain how the erroneous definitions deprived him of a fair trial, and the record does not support a finding of egregious harm. Love's intent or knowledge was not a contested issue at trial. Rather, he advanced defensive theories that Turner's allegations were fabricated or delusional, that he lacked the opportunity to abuse her, and that the investigation by law enforcement was insufficient. "Where no defense is presented which would directly affect an assessment of mental culpability, there is no harm in submitting erroneous definitions of 'intentionally' and 'knowingly.'" *Saldivar v. State*, 783 S.W.2d 265, 268 (Tex. App.—Corpus Christi–Edinburg 1989, no pet.); *see also Jones v. State*, 229 S.W.3d 489, 494 (Tex. App.—Texarkana 2007, no pet.) ("[T]he intent of Jones in touching B.S.S., while it was a part of the State's required proof, was not a contested issue and consequently Jones could not be egregiously harmed by the definition of the intentional and knowing state of mind.").

Additionally, as discussed above, the application paragraph, which tracked the indictment and statutory language of subsection 21.02(b), correctly instructed the jury to find Love guilty if it found beyond a reasonable doubt that he committed two or more acts of aggravated sexual assault against Turner during a period that was 30 or more days in duration. *See* Tex. Penal Code § 21.02(b); *see also Price v. State*, No. 10-22-00047-CR, 2023 WL 4363066, at *2 (Tex. App.—Waco July 5, 2023, no pet.) (mem. op., not designated for

25

publication) (approving of similar application-paragraph language); *Gonzalez v. State*, No. 11-22-00117-CR, 2024 WL 2965154, at \*4 (Tex. App.—Eastland June 13, 2024, no pet.) (mem. op., not designated for publication) ("It is also significant that the application paragraph properly tracked the language of the indictment, the necessary statutory language, and the elements of continuous sexual abuse of a child."). The application paragraph likewise instructed the jury to bear in mind the foregoing abstract portion, which correctly recited the elements of aggravated sexual assault of a child, including the requirement that an offender act intentionally or knowingly. *See* Tex. Penal Code § 22.021(a)(1)(B). We presume that the jury followed the instructions given. *See Miles v. State*, 204 S.W.3d 822, 828 (Tex. Crim. App. 2006). For that reason, when the application paragraph of the jury charge correctly instructs the jury on the law applicable to the case, error in the abstract instruction does not cause egregious harm. *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see Patrick v. State*, 906 S.W.2d 481, 493 (Tex. Crim. App. 1995) ("We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to proving the conduct element of the underlying offense.").

Based on our review of the record, the evidence was of such weight that the incorrect culpable mental state definitions did not make it more likely that Love suffered actual harm or that the jury was unable to render a verdict consistent with that evidence. *See Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015).

The record includes no statements made by either party or the trial court that may have exacerbated the error in the charge. *See id.* at 844. Reflective of the primary contested issue at trial, both parties' arguments largely focused on Turner's credibility and whether the

26

alleged abuse in fact occurred. Although defense counsel in his closing argument repeatedly insisted that he was not challenging Turner's credibility but her "reliability," it was a distinction without a difference. Counsel insinuated that Turner had fabricated allegations by repeating the plot of SVU; asserted that "no details were provided" and that no other witnesses had observed the abuse; stated that "sometimes children, or adults as children, step out to describe things[, but j]ust because [that testimony] exists doesn't mean you have to give it weight"; and rhetorically asked:

> Is she relating something that truly happened? Is this something that is in her brain due to other influences, other issues of abuse and trauma? Hundreds of episodes of SVU that she's consumed? We heard testimony about that, how that was on all the time, has been watched hundreds of times. Again, someone with a dissociation score of 42, high, how strongly can we rely on that? Wouldn't you like to have other evidence beyond just what a high dissociation witness says to you?

Finally, we have not found, nor does Love direct us to, other relevant factors probative of actual harm. *See Gonzalez*, 610 S.W.3d at 27; *Hollander*, 414 S.W.3d at 749–50. Viewing the record as a whole and considering the jury charge, state of the evidence, and arguments of the parties, we conclude that Love was not egregiously harmed by the erroneous culpable mental state definitions in the abstract portion of the charge. *See Gonzalez*, 610 S.W.3d at 27. We overrule his first issue.

### D.     Article 38.37 Instruction

In his third issue, Love contends that the trial court erred by instructing the jury that it could consider evidence of extraneous offenses committed against Turner for character-conformity purposes. The court charged:

27

You are further instructed that if there is any evidence before you in this case regarding the defendant's committing other crimes, wrongs, or acts not alleged in the indictment, you may not consider the defendant's commission of crimes, wrongs, or acts not alleged in the indictment, unless you first find and believe beyond a reasonable doubt that the defendant committed such crimes, wrongs, or acts. Even then, you may only use that evidence for the limited purpose for which it was admitted, as instructed below:

You are instructed that if there is any evidence before you in this case regarding other crimes, wrongs, or acts committed by the defendant against [Turner], you may consider such evidence for its bearing on relevant matters, including the state of mind of the defendant and [Turner], the previous or subsequent relationship between the defendant and [Turner], the character of the defendant, and acts performed in conformity with the character of the defendant.

The trial court's instruction largely tracks article 38.37 of the Texas Code of Criminal Procedure, which governs the admissibility of certain extraneous offenses in prosecutions for child sexual offenses. *See* Tex. Code Crim. Proc. art. 38.37. The statute includes two provisions regarding the purposes for which such extraneous offenses may be admitted. Article 38.37, subsection 1(b) provides:

Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:

(1) the state of mind of the defendant and the child; and

(2) the previous and subsequent relationship between the defendant and the child.

*Id.* at § 1(b). Subsection 2(b) provides, in relevant part, that "evidence that the defendant has committed a separate [child sexual] offense . . . may be admitted . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." *Id.* at § 2(b).

28

Notably, while subsection 1(b) expressly pertains only to extraneous offenses committed against the child-victim of the charged offense, subsection 2(b) is silent as to which extraneous-offense victims it applies. Love argues that the two subsections are *in pari materia*, necessitating the interpretation that only extraneous offenses committed against *a different* child are admissible under subsection 2(b). Interpreting subsection 2(b) to apply to extraneous offenses committed against both the child-victim of the charged offense as well as other children, he reasons, would render subsection 1(b) superfluous. Consequently, he concludes that the trial court erred by instructing the jury that it could consider extraneous offenses committed against Turner as relevant to his character or acting in conformity with his character.

"All statutory construction questions are questions of law, so we review them *de novo*." *Martin v. State*, 635 S.W.3d 672, 677 (Tex. Crim. App. 2021) (citing *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)). When the statute in question is found within the Code of Criminal Procedure, "[a]ll words, phrases and terms used . . . are to be taken and understood in their usual acceptation in common language, except where specially defined," Tex. Code Crim. Proc. art. 3.01, and the Code's provisions must "be liberally construed, so as to attain the objects intended by the Legislature: The prevention, suppression and punishment of crime," Tex. Code Crim. Proc. art. 1.26.

In interpreting a statute, we give effect to the plain meaning of its literal text, unless the statute is ambiguous or the plain meaning leads to absurd results that the Legislature could not possibly have intended. *State v. Kahookele*, 640 S.W.3d 221, 225 (Tex. Crim. App. 2021); *Chambers*, 580 S.W.3d at 155. We read words and phrases in context; construe them according to normal rules of grammar and usage; presume that every word has been used for a purpose; and give effect to each word, phrase, clause, and sentence when reasonably possible.

29

*Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020); *Chambers*, 580 S.W.3d at 155. Where statutory terms have a technical meaning, we will construe them consistent with that meaning. *Dunham v. State*, 666 S.W.3d 477, 484 (Tex. Crim. App. 2023).

"A statute is unambiguous when it reasonably permits only one understanding," and we "will not add to or subtract from such a statute." *Id.* (citing *State v. Schunior*, 506 S.W.3d 29, 35 (Tex. Crim. App. 2016); *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). Only if the statute's language is ambiguous or the plain language would lead to absurd consequences can we "review a variety of extra-textual resources to determine its meaning." *Stahmann*, 602 S.W.3d at 577; *see Kahookele*, 640 S.W.3d at 225 (noting that we may consider such extratextual factors as legislative history "out of necessity"); *Boykin*, 818 S.W.2d at 785–86 (explaining that "then *and only then*, out of absolute necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such extratextual factors as executive or administrative interpretations of the statute or legislative history").

The doctrine of in pari materia is a rule of statutory construction to discern and effectuate legislative intent. *Mills v. State*, 722 S.W.2d 411, 413 (Tex. Crim. App. 1986). Two statutes are in pari materia when they "'deal with the same general subject, have the same general purpose, or relate to the same person or thing or class of persons or things,'" even though the statutes were passed at different times or during different legislative sessions. *Ex parte Nuncio*, 662 S.W.3d 903, 923 (Tex. Crim. App. 2022) (quoting *Cheney v. State*, 755 S.W.2d 123, 126 (Tex. Crim. App. 1988)). Similarity of purpose is the most important factor, and the statutes must be closely enough related to justify interpreting one in the light of the other. *Burke v. State*, 28 S.W.3d 545, 547 (Tex. Crim. App. 2000). When statutes are in pari materia, we construe

30

them together as though they were part of the same law. *Ex parte Nuncio*, 662 S.W.3d at 923. Any conflict between their provisions will be harmonized, if possible, and effect will be given to all the provisions of each act if they can be made to stand together and have concurrent efficacy. *Id.*

The doctrine only applies, however, when one of the statutes deals with a subject in general or comprehensive terms, the other addresses a part of the subject in a more detailed way, and the two statutes irreconcilably conflict. *See State v. Vasilas*, 253 S.W.3d 268, 272–73 (Tex. Crim. App. 2008) (quoting 67 Tex. Jur. 3d Statutes § 133 (Supp. 2008)); *Lomax v. State*, 233 S.W.3d 302, 312 (Tex. Crim. App. 2007); *Alejos v. State*, 555 S.W.2d 444, 450 (Tex. Crim. App. 1977) (op. on reh'g). "Two statutes irreconcilably conflict when only one of them can apply to a particular situation." *Lomax*, 233 S.W.3d at 312. The fact that they both might apply to the same conduct in some situations does not mean that they irreconcilably conflict with one another. *See Patterson v. State*, 496 S.W.3d 919, 926 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (citing *Lomax*, 233 S.W.3d at 312).

Subsections 1(b) and 2(b) of article 38.37 are not general and specific provisions with the same purpose and subject matter. *See* Tex. Code Crim. Proc. art. 38.37, §§ 1(b), 2(b). Although, broadly speaking, both statutes pertain to the admissibility of extraneous-offense evidence in child sexual offense cases, the subsections apply in prosecutions for different offenses, involve different extraneous acts, and authorize the admission of evidence for different purposes. Whereas subsection 1(b) governs the admissibility of evidence of "other crimes, wrongs, or acts" committed against "the victim of the alleged offense" subsection 2(b) pertains to "evidence that the defendant has committed a separate [listed Penal Code] offense." Evidence under the former is admissible for its bearing on the defendant's and child-victim's states of

31

mind and their relationship; evidence under the latter is admissible for any purpose, including to show propensity and character-conformity. Consequently, we conclude that they are not in pari materia. *See Alejos*, 555 S.W.2d at 450–51.

Further, even if subsections 1(b) and 2(b) possessed the proper orientation toward one another, they do not irreconcilably conflict. It is not enough to show, as Love asserts, that an extraneous offense committed against the child-victim of the charged offense might in certain circumstances be admissible under both statutes. *See Lomax*, 233 S.W.3d at 312. Nor would such a showing render subsection 1(b) superfluous. For example, the commission of an unindicted aggravated sexual assault against the child-victim of the charged offense might be admissible under either provision. However, propensity or character-conformity does not subsume—as a basis for relevance—the defendant's or child's state of mind or the nature of their relationship, and subsection 1(b) would also apply to conduct that does not constitute a listed Penal Code offense. For these reasons, we do not agree that subsection 1(b) compels the interpretation that subsection 2(b) applies only to offenses committed against children *other than* the child-victim of the charged offense.

"The best evidence of the Legislature's intent is the plain language of the law it passed." *Chambless v. State*, 411 S.W.3d 498, 503–04 (Tex. Crim. App. 2013). There is nothing in the unambiguous wording of subsection 1(b) to suggest that it applies only to certain children, and we will not adopt such a construction by adding to the statute. *See Dunham*, 666 S.W.3d at 484; *see also Johnson v. State*, No. 03-22-00508-CR, 2024 WL 1313591, at *3 (Tex. App.—Austin Mar. 28, 2024, pet. ref'd) (mem. op., not designated for publication) (noting that article 38.37 does not state that "evidence" is limited to judgment and refusing to accept non-statutory limitation). Indeed, subsection 1(b) shows that had the Legislature wanted to limit the victims to

32

whom subsection 2(b) applied, it was capable of doing so. We will not read into a statute words that the Legislature elected to omit, and our refusal to limit artificially subsection 2(b)'s terms does not lead to an absurd result that the Legislature could not have intended. *See Chambers*, 580 S.W.3d at 155; *Kahookele*, 640 S.W.3d at 225 ("Generally, a statute's 'expression of one thing implies the exclusion of other, unexpressed things.'" (quoting *Chambers*, 580 S.W.3d at 156)); *see also Villarreal v. State*, 470 S.W.3d 168, 172 (Tex. App.—Austin 2015, no pet.) (applying subsection 2(b) to extraneous offenses committed against child-victim of charged offense).[2]

Liberally construing subsection 2(b) as required to prevent, suppress, and punish crime, we conclude that the statute is not limited to offenses committed against children other

---

[2] We are cognizant of the split between our sister courts in characterizing the scope of subsection 2(b). *Compare Wishert v. State*, 654 S.W.3d 317, 330 (Tex. App.—Eastland 2022, pet. ref'd) ("the 'child victim' of the separate offense need not be the victim of the offense for which the defendant is currently on trial"); *Gutierrez v. State*, 585 S.W.3d 599, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("against any person"); *Perez v. State*, 562 S.W.3d 676, 685 (Tex. App.—Fort Worth 2018, pet. ref'd) ("not limited to evidence of offenses committed against the child who is the victim in the immediate prosecution"); *Ryder v. State*, 514 S.W.3d 391, 401 (Tex. App.—Amarillo 2017, pet. ref'd) ("any child, not just the current victim"), *with Dies v. State*, 649 S.W.3d 273, 284 (Tex. App.—Dallas 2022, pet. ref'd) ("against another child"); *Deggs v. State*, 646 S.W.3d 916, 922 (Tex. App.—Waco 2022, pet. ref'd) ("against another child"); *Holcomb v. State*, No. 09-16-00198-CR, 2018 WL 651228, at *2 (Tex. App.—Beaumont Jan. 31, 2018, pet. ref'd) (mem. op., not designated for publication) ("against children other than the complaining witness in the charged offense"); *Guerra v. State*, No. 01-15-00650-CR, 2016 WL 6212999, at *20 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op., not designated for publication) ("children other than the victim of the alleged offense"); *Fronek v. State*, No. 05-14-01118-CR, 2016 WL 3144243, at *3 (Tex. App.—Dallas June 6, 2016, pet. ref'd) (mem. op., not designated for publication) ("child *other than* the victim of the charged offense"); *Belcher v. State*, 474 S.W.3d 840, 846–47 (Tex. App.—Tyler 2015, no pet.) ("children other than the complainant"); *see also Jacobs v. State*, 560 S.W.3d 205, 219 (Tex. Crim. App. 2018) (Richardson, J., dissenting) ("Under Article 38.37, sections 2(a) and 2(b), extraneous prior sexual offenses (not assaultive offenses) committed against a different child (not the complainant) are allowed to be admitted.").

than the child-victim of the charged offense. *See* Tex. Code Crim. Proc. art. 1.26. Consequently, the trial court's instruction was not erroneous, and we overrule Love's third issue.

### E.    Parole Instruction

In his fourth issue, Love contends that the trial court erred by not instructing the jury that he was ineligible for parole. Citing a case from our sister court, *Villarreal v. State*, 205 S.W.3d 103, 107 (Tex. App.—Texarkana 2006, pet. dism'd), he argues that "[w]hen it became apparent that the jury was concerned with the application of the parole law, the trial court was required to give the mandatory parole instruction."

Subsection 4(a) of article 37.07 of the Code of Criminal Procedure provides that, with certain exceptions, in the punishment phase of a felony trial, a trial court must instruct a jury in writing about a defendant's parole eligibility. *See* Tex. Code Crim. Proc. art. 37.07, § 4(a). Among the exceptions, the parole instruction is not required for offenses arising under section 21.02 of the Penal Code, the statute under which Love was charged. *See id.*; Tex. Penal Code § 21.02. Subsection 508.145(a)(2) of the Texas Government Code likewise provides that inmates serving sentences for continuous sexual abuse are not eligible for release on parole. *See* Tex. Gov't Code § 508.145(a)(2).

When a trial court responds substantively to a jury question during deliberations, the court's response "essentially amounts to an additional or supplemental jury instruction" that is subject to the rules governing instructions. *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993). However, a response that merely refers to the original charge or informs the jury that the court is unable to answer does not constitute an additional jury instruction. *See id.*; *Earnhart v. State*, 582 S.W.2d 444, 450 (Tex. Crim. App. 1979).

In *Villarreal*, which involved a prosecution for aggravated sexual assault, the trial court omitted the mandatory article 37.07 parole instruction from the punishment charge. 205 S.W.3d at 105. During its deliberations, the jury asked the trial court, "Is it possible to find out how many years [defendant] would actually serve compared to how many we sentence," and the court responded, "No. Such information is completely beyond our control. It is controlled entirely by the Board of Pardons and Paroles." *Id.* The record did not show that the trial court read the note in open court or allowed the defendant to object to the court's response. *Id.* The court of appeals held that once the jury expressed its concern with the application of parole law, the trial court was required to give the article 37.07 instruction and that its failure to do so egregiously harmed the defendant. *Id.* at 107–110.

The present case is distinguishable. As noted, Love was not entitled to a parole instruction under article 37.07. *See* Tex. Code Crim. Proc. art. 37.07, § 4(a). When the jury during deliberations asked whether there was a possibility of parole, the trial court did not respond substantively but directed the jury to the charge: "All the law applicable in this case is contained in the charge. Please continue your deliberations." *See Daniell*, 848 S.W.2d at 147. Love's trial counsel expressly stated that he had no objection to the court's reply. Love has directed us to no other authority for the proposition that a trial court errs by not instructing the jury on parole eligibility in a trial for continuous sexual abuse of a young child. We conclude that the trial court's failure to include such an instruction in the written charge was not error. *See Chavez v. State*, No. 05-12-00415-CR, 2013 WL 2420651, at *3 (Tex. App.—Dallas June 3, 2013, pet. ref'd) (not designated for publication) (concluding, in appeal from continuous sexual abuse conviction, that once it received jury note and became aware that jury was considering parole implications, trial court "did not err by failing *sua sponte* to provide a special,

35

non-statutory curative instruction to the jury that it may not consider the effects of parole"). Love's fourth issue is overruled.

### F. Cumulative Harm

Although Love does not raise it as a distinct issue, he asserts that we should consider the "synergistic effect" of the alleged charge errors and find that they in combination egregiously harmed him and "ensure[d] that [he] was denied a fair trial and an accurate verdict."

"It is conceivable that a number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). However, this is rare and occurs only if the cumulative effect of the errors rendered the trial "fundamentally unfair." *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (citing *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)). Moreover, "we are aware of no authority holding that non-errors may in their cumulative effect cause error." *Chamberlain*, 998 S.W.2d at 238. Because we determined above that the sole charge error—the erroneous culpable mental state definitions in the charge's abstract portion—was not egregiously harmful, we cannot conclude that the error, in combination with the non-errors identified by Love, caused cumulative egregious harm or rendered his trial fundamentally unfair. *See id.*; *Estrada*, 313 S.W.3d at 311.

## II. Admission of Unfairly Prejudicial Extraneous-Offense Evidence

In his fifth issue, Love contends that the trial court abused its discretion by admitting evidence of extraneous offenses committed against Turner in violation of Texas Rule of Evidence 403. *See* Tex. R. Evid. 403. Specifically, he challenges the admission of

36

offenses that occurred outside the period covered by the indictment—"from on or about September 1, 2007 through March 31, 2009."

We review a trial court's decision to admit evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). We may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *Henley*, 493 S.W.3d at 83. An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

Although extraneous-offense evidence is admissible under article 38.37, the trial court must still, upon proper objection or request, conduct a Rule 403 balancing test. *See Hitt v. State*, 53 S.W.3d 697, 706 (Tex. App.—Austin 2001, pet. ref'd). Thus, the trial court may exclude relevant evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. The court's balancing test need not be performed on the record. *Hitt*, 53 S.W.3d at 706.

"Probative value" means more than relevance; rather, it "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App.

2006). "Unfair prejudice" refers to a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*; *see Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). Under the Rule, trial courts have "considerable freedom in evaluating proffered evidence's probative value in relation to its prejudicial effect," and there should be "a corresponding reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378.

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco*, 210 S.W.3d at 641–42). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642.

### A. Inherent Probative Value

The Court of Criminal Appeals has explained that the probative value of evidence "is often, although by no means invariably, a function of the similarity of the extraneous transaction to the charged offense." *Montgomery*, 810 S.W.2d at 390. Consistent with his

interpretation of subsection 2(b)'s scope, Love argues that because the challenged extraneous offenses "did not involve a different witness, [they were] not particularly probative." He cites no authority in support of this supposition.

Subsection 1(b) provides that evidence of extraneous offenses committed against the child-victim of the charged offense is relevant to the defendant's and child's states of mind and the nature of their relationship before and after the charged conduct; both bases for relevancy were placed at issue during Love's trial. *See* Tex. Code Crim. Proc. art. 38.37, § 1(b); *see also Ernst v. State*, 971 S.W.2d 698, 700 (Tex. App.—Austin 1998, no pet.) (holding that "the victim's testimony of other sexual conduct inflicted by appellant was relevant to show appellant's state of mind and the previous relationship between appellant and the victim"). Courts, including this one, have also found that extraneous offenses committed against the victim of a charged child sexual offense are probative to rebut a defensive theory of fabrication, *see Ernst*, 971 S.W.2d at 701; *James v. State*, 623 S.W.3d 533, 548 (Tex. App.—Fort Worth 2021, no pet.); to show that the defendant possessed the necessary intent and ability to commit the charged offense, *see Poole v. State*, 974 S.W.2d 892, 898 (Tex. App.—Austin 1998, pet. ref'd); to demonstrate that the victim was forced to acquiesce, *see id.*; to explain how "a person in a position of authority, custody, or care of a young child has developed an unnatural attitude and relationship toward that child to explain the charged act—an act that would otherwise seem wholly illogical and implausible to the average juror," *see id.*; to reveal the defendant's dominance over the victim and her fear of him, *see McCulloch v. State*, 39 S.W.3d 678, 681 (Tex. App.—Beaumont 2001, pet. ref'd); to answer how the defendant was able to commit the offense without being apprehended, *see id.*; and to provide a reason for the victim's not reporting abuse sooner, *see Walker v. State*, 4 S.W.3d 98, 103 (Tex. App.—Waco 1999, pet. ref'd).

39

The extraneous offenses committed by Love against Turner were similar in kind, intensity, and frequency to his charged conduct. They helped to explain to the jury Love and Turner's states of mind and relationship, including Turner's reluctance to report the abuse, Love's ability to manipulate her actions and the perceptions of observers, Turner's struggles with substance abuse and interpersonal relationships, and the seeming warmth of her interactions with Love following the abuse's cessation. The evidence's probative value was magnified by the "he said/she said" nature of the trial and the defensive theories of fabrication and delusion advanced by Love. *See Ernst*, 971 S.W.2d at 701. Although the remoteness of some of the extraneous acts may have somewhat inhibited the evidence's probative value, *see Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd), the fact that the evidence reflected a "continuing course of conduct" supports finding that the extraneous offenses were not too remote to be probative, *see Brickley v. State*, 623 S.W.3d 68, 81 (Tex. App.—Austin 2021, pet. ref'd).

For these reasons, this factor weighs strongly against finding that the trial court abused its discretion by admitting the extraneous-offense evidence.

## B.  State's Need for Evidence

The State's need for the extraneous-offense evidence was substantial. As discussed above, the evidence helped to address questions that jurors may have had, such as why Turner did not outcry again as a child following her failed attempt when five years old, why Love was able to escape detection for so long, and how the indicted acts could have occurred in a relationship that both Turner herself and other witnesses described as otherwise seemingly healthy. Much of the State's case amounted to Turner's word against Love's, and the defense focused heavily on challenging her credibility, suggesting that her allegations were the product

40

of mental illness and questioning when Love would have had the opportunity to abuse her. *See Robisheaux*, 483 S.W.3d at 220 (determining that State's need for evidence "weighs strongly in favor of admission" because without the evidence, the State's case would have amounted to the complainant's word against the defendant's); *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd) (finding that trial court could have reasonably concluded that State's need for evidence was "considerable" because there were no corroborating eyewitnesses or physical evidence, and State had to rebut defensive theory of fabrication). Further, certain portions of Turner's extraneous-offense testimony, including Love's use of a pillow and lubricants, his plying her with alcohol, and his massaging her and Mitchell, were corroborated by other witnesses, increasing the credibility of Turner's testimony with respect to Love's charged conduct. The extraneous-offense evidence likewise provided context and inculpatory force to many of his statements during the call, on which Turner repeatedly referenced the duration of the abuse. Accordingly, this factor weighs against finding that the trial court abused its discretion by admitting the extraneous-offense evidence.

## C. Tendency to Suggest a Decision on an Improper Basis, Confuse or Distract, or Be Given Undue Weight

Although sexually-related bad acts and misconduct involving children are inherently inflammatory, the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013); *see Gaytan v. State*, 331 S.W.3d 218, 227–28 (Tex. App.—Austin 2011, pet. ref'd). Rather, "only 'unfair' prejudice provides the basis for exclusion of relevant evidence." *Montgomery*, 810 S.W.2d at 378.

Both the trial court's charge and the State's closing argument mitigated any improper influence of the extraneous-offense testimony. *See Gaytan*, 331 S.W.3d at 228. The charge instructed that the jury could only consider extraneous offenses if it first found beyond a reasonable doubt that Love had committed them and even then only for statutorily-permissible purposes. *See Wishert*, 654 S.W.3d at 334 ("[N]one of the permissible uses of this proffered evidence under the applicable evidentiary rules—namely, Rule 403 and Article 38.37, Section 2(b)—weigh in favor of a finding of unfair prejudice."). The charge also instructed that to convict, jurors had to find beyond a reasonable doubt that Love committed at least two acts of aggravated sexual assault during the time period specified in the indictment and that in deciding his guilt, jurors were "not to consider any conduct that occurred before September 1, 2007 [or] after November 21, 2009, except for the limited purposes as set forth." *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) ("[T]he impermissible inference of character conformity can be minimized through a limiting instruction."); *Reed v. State*, 680 S.W.3d 620, 627 (Tex. Crim. App. 2023) ("We generally presume that the jury followed the trial court's instructions.").

Similarly, in its closing argument, the State explained:

> You're not allowed to consider any conduct that occurred before September 1st, 2007, or after November 21st, 2009, except for the limited purposes that is set forth. That's that legalese. Like, you can consider it, not for the guilt of the offense. The guilt of the offense of continuous is those specific dates that we've alleged. The before and after, you can consider that for the nature of the relationship between [Turner] and the defendant, his character and conformity therewith. So you may consider it for those reasons.

Turner's extraneous-offense testimony was not technical or scientific, was relevant to whether Love committed the charged offense, and pertained to matters including

victim credibility that could be easily comprehended by laypeople. *See Gaytan*, 331 S.W.3d at 228; *Deggs v. State*, 646 S.W.3d 916, 927 (Tex. App.—Waco 2022, pet. ref'd). Although it encompassed inflammatory and serious allegations of child sexual abuse, these allegations were no more serious than those concerning Love's charged conduct. *See Robisheaux*, 483 S.W.3d at 220. Among the acts that Turner alleged during the period covered by the indictment were anal rape, inappropriate touching, the provision of alcohol and pain medication as a means to facilitate abuse, oral sex, use of sex toys, the showing of pornographic videos, and forcible restraint.

This factor therefore weighs against finding that the trial court abused its discretion by admitting the extraneous-offense evidence.

### D. Time Needed to Develop Evidence

This factor addresses whether the jury would be distracted from consideration of the charged offense. *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005). In calculating the time needed to develop the extraneous-offense evidence, we exclude jury argument and hearings held outside the jury's presence, *see Dennis v. State*, 178 S.W.3d 172, 181 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd), and include "any testimony introduced regarding the evidence, including cross-examination, redirect examination, and any rebuttal offered by the defense in response to the evidence," *Hart v. State*, 688 S.W.3d 883, 893 (Tex. Crim. App. 2024).

The parties agree that Turner's extraneous-offense testimony amounted to approximately 56 pages of the approximately 500-page trial transcript. Love argues that this factor weighs in favor of exclusion when the testimony "comprises at least fifteen percent of the

43

testimony." In support of this assertion, he cites *Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Fort Worth 2018, pet. ref'd) (finding that factor weighed "slightly in favor" of excluding testimony when extraneous-offense testimony compromised "roughly fifteen percent" of total testimony presented by both sides during guilt and innocence stage), and *Russell v. State*, 113 S.W.3d 530, 545–46 (Tex. App.—Fort Worth 2003, pet. ref'd) (concluding factor weighed in favor of exclusion because testimony regarding extraneous offense took up approximately "thirty percent of the trial"). Love states that

> [o]f the ninety-six pages of [Turner's] testimony, only twenty-one were devoted to the charged offense. Fifty-six pages of [her] testimony were devoted to the extraneous offense – almost three times the length of the testimony on the charged offense.

We should instead evaluate the length of the extraneous-offense testimony in the context of the relevant part of the trial transcript. The precise ratio is less important than determining whether the jury was distracted from the charged offense. *Cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony); *Perez*, 562 S.W.3d at 691; *Russell*, 113 S.W.3d at 545–46. Under the facts of this case, we cannot say that the jury was distracted by the length of the extraneous-offense testimony. Thus, this factor weighs slightly in favor of finding that the trial court did not abuse its discretion by admitting the extraneous-offense evidence.

In summation, each *Gigliobianco* factor weighs in favor of finding that the trial court did not abuse its discretion by admitting the evidence over Love's Rule 403 objection. *See Henley*, 493 S.W.3d at 82–83. We overrule his fifth issue.

## III.     Contemporaneous Limiting Instruction

In his sixth issue, Love contends that the trial court abused its discretion by denying his request for a contemporaneous limiting instruction when the court admitted Turner's extraneous-offense testimony.  The following exchange occurred during the Rule 403 hearing held outside the jury's presence prior to Turner's testimony:

> DEFENSE COUNSEL: And then I would also ask for a limiting instruction that the jury be reminded now, before we get into this, that they are to consider – they are not to consider these extraneous offenses as proof of the case in chief.  The –
>
> THE STATE: I think we can address that in the jury charge, Your Honor.
>
> THE COURT: I think it's contained in the jury charge, as well.
>
> DEFENSE COUNSEL: Okay.  Thank you, Your Honor.

Love asserts that the trial court implicitly ruled on his request by "delaying the provision of the requested limiting instruction until the jury charge."  In response, the State argues that Love's issue is unpreserved because defense counsel did not pursue his request to an adverse ruling or, alternatively, forfeited his request.

To preserve error for appellate review, the record must show that:  "1) the complaining party made a timely and specific request, objection, or motion; and 2) the trial judge either ruled on the request, objection, or motion (expressly or implicitly), or he refused to rule and the complaining party objected to that refusal."  *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *see also* Tex. R. App. P. 33.1(a).  An adverse ruling must be "conclusory; that is, it must be clear from the record the trial judge in fact overruled the defendant's objection or otherwise error is waived."  *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991). However, the ruling "need not be expressly stated" if the trial court's "actions or other statements

45

otherwise unquestionably indicate a ruling." *Rey v. State*, 897 S.W.2d 333, 336 (Tex. Crim. App. 1995). A reviewing court will generally find that a trial court made an implicit ruling when "the objection was brought to the trial court's attention and the trial court's subsequent action clearly addressed the complaint." *State v. Kelley*, 20 S.W.3d 147, 154 n.3 (Tex. App.—Texarkana 2000, no pet.); *see also Miller v. State*, 83 S.W.3d 308, 319 (Tex. App.—Austin 2002, pet. ref'd) (finding trial court's ruling may be implied when court's actions or statements "unquestionably indicate a ruling").

In many cases, a trial judge will take an affirmative action to indicate an implicit ruling. *See Miller*, 83 S.W.3d at 319; *see also Chappell v. State*, 850 S.W.2d 508, 510 (Tex. Crim. App. 1993) (overruling defendant's objection to jury shuffle when trial judge granted State's motion to shuffle); *Ramirez*, 815 S.W.2d at 650 (finding trial judge "implicitly overruled" defendant's objection to State's question by directing witness to answer question); *Beebe v. State*, 811 S.W.2d 604, 605 (Tex. Crim. App. 1991) (concluding error was preserved where defendant requested additional time and trial judge stated he would attempt to dispose of all pending cases if "humanly possible" in the morning); *Leal v. State*, 469 S.W.3d 647, 650 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (finding that trial court implicitly overruled defendant's motion to suppress by admitting blood-analysis report and allowing analyst to testify to defendant's blood alcohol content); *Cantu v. State*, 994 S.W.2d 721, 730–31 (Tex. App.—Austin 1999, pet. ref'd) (determining that trial court implicitly overruled defendant's objection that witness was not qualified to answer question by instructing witness that he could answer if he knew).

We agree with the State that the trial court's statement did not unquestionably indicate a conclusory, implicit adverse ruling. *See Ramirez*, 815 S.W.2d at 643; *Miller*,

83 S.W.3d at 319. The court took no affirmative action but rather refrained from acting, presumably in response to defense counsel's seeming acquiescence to deferring the instruction until the charge. *Cf. Miller*, 83 S.W.3d at 319.

The court's statement and counsel's reply are similar to other cases in which courts have found that counsel either abandoned an objection or failed to pursue it to an adverse ruling. In *Flores v. State*, trial counsel objected to the State's jury argument and moved for a mistrial. 871 S.W.2d 714, 722–23 (Tex. Crim. App. 1993). The trial judge responded by cautioning the jury that "what the attorneys say is not evidence and cannot be considered by you as any evidence. You'll be guided by the instructions of the Court only." *Id.* at 723. The Court of Criminal Appeals explained that "[a]lthough the judge did not give a clear instruction to disregard and did not rule on appellant's motion for a mistrial, appellant, apparently being satisfied, did not pursue his objection in order to obtain an adverse ruling. Where an adverse ruling is not obtained, nothing is preserved for review." *Id.*

*Dunn v. State* involved the following exchange that occurred at trial between the court and pro se defendant:

> THE DEFENDANT: Before the State's witness takes the stand, may I make a brief statement to the jury?
>
> THE COURT: You will be able to do that when it comes your time to put on your evidence.
>
> THE DEFENDANT: Thank you.

819 S.W.2d 510, 523 (Tex. Crim. App. 1991).

The Court of Criminal Appeals concluded that "[a]lthough appellant requested to make an opening statement it is obvious that he capitulated [to] the trial court's ruling." *Id.* at

524; *see also*, *e.g.*, *Anderson v. State*, 932 S.W.2d 502, 507 (Tex. Crim. App. 1996) (finding defendant did not receive adverse ruling where counsel objected to improper argument, and trial court replied, "The jury's been instructed. [State], you have two minutes left"); *Graham v. State*, 566 S.W.2d 941, 954 (Tex. Crim. App. 1978) (noting that "[a]fter counsel objected the court instructed the prosecutor to confine his remarks to the record" and that "[n]o adverse ruling was obtained"); *Zemen v. State*, 912 S.W.2d 363, 367 (Tex. App.—Houston [14th Dist.] 1995, no pet.) (concluding that trial judge's statement, "I'll let the jury decide the evidence as they heard it," did not constitute ruling on defendant's objection); *cf. Ruffins v. State*, 666 S.W.3d 636, 640, 643 (Tex. Crim. App. 2023) (holding that defendant was estopped from challenging reasonable-doubt instruction because his claim was inconsistent with his trial statement, "I'm good"—which followed brief discussion about instruction between parties and trial court).

The cases cited by Love are, on the other hand, distinguishable because they involve defendants acknowledging an unambiguous adverse ruling. In *Tucker v. State*, the trial court expressly denied the defendant's request to make an opening statement:

> After the State rested its case in a trial for delivery of cocaine, the appellant's counsel said, "At this time the defense would like to make an opening statement."
>
> The court ruled, "That will be denied."
>
> Counsel said, "Okay. In that case we will call [our first witness]."

990 S.W.2d 261, 261 (Tex. Crim. App. 1999). The Court of Criminal Appeals determined that

> *in the context of this case*, the word "Okay" cannot support the court of appeals' finding of waiver. It is well recognized that "we [lawyers] use crutch words and phrases to give us time to think of what to ask next, a practice that creates an instant habit of starting each question with, 'Let me ask you this,' and following every response with, 'I see.'" Here "Okay" is one of those crutch words, not a waiver.

48

*Id.* at 263 (emphasis added).

Likewise, in *Marquez v. State*, the Court again concluded that the defendant had not waived error when defense counsel stated "Okay" after an adverse ruling:

> [Appellant's counsel:] Your Honor, for greater purposes we realize that we have filed a request to have this case tried before the court, but just a little while ago my client informed me that he wishes to retract that and have a jury trial in this matter.
>
> [The Court:] He's waived a jury trial, so if he's not ready for this case, then it's too late now to change.
>
> [Appellant's counsel:] Okay.

921 S.W.2d 217, 219 (Tex. Crim. App. 1996).

The trial court's statement in the present case, unlike those in *Tucker* and *Marquez*, was not unquestionably a ruling that clearly and adversely disposed of Love's request for a contemporaneous limiting instruction. *See Ramirez*, 815 S.W.2d at 643; *Miller*, 83 S.W.3d at 319. Further, defense counsel's statement—"Okay. Thank you, Your Honor—" is better understood in context not as a verbal crutch to buy more time but as an acquiescence or capitulation to the trial court and State's remarking that the requested instruction was already in the charge. For these reasons, we conclude that Love did not preserve this issue for appellate review. *See Geuder*, 115 S.W.3d at 13; Tex. R. App. P. 33.1(a). His sixth issue is overruled.

## CONCLUSION

Having overruled all of Love's issues, we affirm the trial court's judgment of conviction.

49

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed:   December 23, 2024

Publish